MACABE COMPANY, INC., ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4781–62—4785–62. Filed September 29, 1964.

*Nathan L. Cohen*, for the petitioners.
*John D. Picco*, for the respondent.

**OPINION**

FAY, *Judge:* The respondent determined a deficiency of $45,935.83 in the income tax of petitioner Macabe Co., Inc. (hereinafter sometimes referred to as the petitioner), for its fiscal year ended July 31,

---

[1] Proceedings of the following petitioners are consolidated herewith: Abe Frederick Vidgoff, Transferee of Assets of Macabe Co., Inc., docket No. 4782–62 ; Sally Louise Vidgoff, Transferee of Assets of Macabe Co., Inc., docket No. 4783–62 ; Dorothy Tongue Macnamara, Transferee of Assets of Macabe Co., Inc., docket No. 4784–62 ; and Estate of Gerard Macnamara, Transferee of Assets of Macabe Co., Inc., Dorothy T. Macnamara, Executrix, docket No. 4785–62.

1958.[2] The deficiency results from the disallowance of a depreciation deduction on an office building owned by petitioner in the year it sold the building. Respondent contends that petitioner is not entitled to depreciation on the building in the year of sale because the aggregate depreciation taken by petitioner thereon in prior years, plus an amount respondent regards as the salvage value of the building, exceeds the petitioner's original cost therein. It is respondent's position that the salvage value of the building is to be determined by reference to the sales proceeds received by petitioner. In order to decide whether petitioner is entitled to the depreciation deduction claimed, we must first decide whether, under the circumstances of this case, the amount received by petitioner upon the sale is relevant to or determines the salvage value of the building.

It has been stipulated that if the respondent's disallowance of the depreciation deduction claimed by the petitioner for its fiscal year ended July 31, 1958, is sustained by this Court, the amount of the deficiency determined by respondent is correct. The parties have further agreed that the petitioners involved in docket Nos. 4782–62 to 4785–62, inclusive, would be liable for any such deficiency as the transferees of the assets of Macabe Co., Inc., pursuant to section 6901.[3]

All of the facts have been stipulated, are so found, and are incorporated herein by this reference. Those necessary to an understanding of our inquiry are recited below.

The petitioner was incorporated under Oregon law on or about February 15, 1947. It timely filed its income tax return for its fiscal year ended July 31, 1958, with the district director of internal revenue, district of Oregon.

The petitioner acquired in 1946 [4] a plot of land in downtown Portland, Oreg., together with a building thereon, originally constructed in 1904 as a seven-story brick warehouse but converted into a ramp garage during the early 1930's. The petitioner then proceeded to demolish the building on said land, leaving only the original structural

---

[2] Respondent asserted an additional deficiency with regard to the income tax of petitioner Macabe Co., Inc., for its fiscal year ended July 31, 1957. This deficiency resulted from respondent's determination that the useful life to petitioner of an office building owned by it should be increased from 33⅓ to 40 years and that, accordingly, the depreciation deduction allowable for that year should be decreased. In their stipulation of facts the parties have reached a compromise as to this item.

[3] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.

[4] The parties have not explained the seeming disparity in their stipulation between the date of the petitioner's incorporation "on or about February 15, 1947," and the statement also contained therein that "In 1946 Macabe Company, Inc. acquired [the property herein involved]." However, the actual date upon which the petitioner acquired the property, or the form of its organization at that time, whether a partnership or otherwise, is not relevant to the issue involved herein.

steel frames, foundations, basement, and brick exterior walls. Upon this skeleton, the petitioner constructed a ceramic-tile-faced, eight-story office building. When completed in 1949, the building was assigned a basis of $2,835,161.55 and the land a basis of $77,204.64.

Between the years 1949 and 1958 the fair market value of downtown Portland rental properties (into which category the building falls) increased substantially.

One of the principal stockholders of the petitioner died on August 15, 1957. Motivated in part by the cash requirements of the estate of the deceased stockholder, the directors and stockholders of the petitioner resolved to sell the building and land and liquidate the petitioner pursuant to section 337. On July 25, 1958, 6 days prior to the expiration of its fiscal year, the petitioner sold the building and land for $3,900,000 under an agreement which provided that it would pay all of the building operating expenses and retain all of the operating income therefrom to and including July 31, 1958, the end of its fiscal year. Thereafter the building was operated by the purchaser.

After the payment of its then ascertained liabilities, the petitioner, pursuant to its plan of liquidation under section 337, distributed its remaining assets to the individual petitioners involved in docket Nos. 4782-62 to 4785-62, inclusive, who at that time were petitioner's sole stockholders.

For each year from 1949 through its fiscal year ended July 31, 1957, the petitioner claimed a depreciation deduction with respect to the building in the amount of $85,054.85. In computing the annual depreciation allowance for the building, the petitioner employed the straight-line method, using an estimated useful life of $33\frac{1}{3}$ years,[5] and estimated that the building after 78 years of service would have a zero salvage value. As of the commencement of its fiscal year ended July 31, 1958, the petitioner had theretofore claimed depreciation on the building in the aggregate amount of $755,099.89.[6] In its final income tax return covering the year of the sale, the petitioner computed depreciation on the building for the entire year, claiming a deduction therefor in the amount of $85,054.85 and reported a capital gain of $1,699,350.15, being the excess of the sales price over its basis in the land and its depreciated basis in the building as of July 31, 1958. The

---

[5] The term "useful life" as used herein means the period during which a taxpayer reasonably estimates he will use a depreciable asset. Although in some cases, like the one now before us, the useful life of the asset to a taxpayer may be the full physical or economic life of the property, useful life is not necessarily equivalent to the physical or economic life of the asset. See fn. 14, infra.

[6] This amount, by stipulation, was later reduced slightly.

amount received for the building upon its sale exceeded its adjusted basis as of the start of the year of sale.[7]

Under the circumstances of this case, the petitioner's estimate of a zero salvage value for the building was reasonable.

Respondent, relying on *Cohn* v. *United States*, 259 F. 2d 371 (C.A. 6, 1958), and section 1.167, Income Tax Regs., disallowed the depreciation deduction taken by the petitioner with respect to the building in the year of its sale. Aside from claiming in the same notice of deficiency that, with respect to petitioner's fiscal year ended July 31, 1957, the year prior to that in which the sale occurred, the useful life of the building should be increased from 33⅓ years to 40 years, respondent did not attempt to redetermine or recompute the useful life of the building as of the year of its sale.[8]

Respondent contends that petitioner is not entitled to a depreciation deduction for the building in its fiscal year ended July 31, 1958, because (1) the sales proceeds received by petitioner show that the building had not depreciated, but had appreciated in value and (2) petitioner had fully recovered before the end of that year (by virtue of the sales proceeds for the building) more than its undepreciated basis in the building as of the beginning of said year. Respondent maintains that this disallowance is necessary to carry out the underlying purpose of section 167, which sanctions the tax-free recovery of the cost of depreciable property used in the taxpayer's trade or business or held for the production of income. See H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 22. It is the respondent's position that if a depreciation deduction were allowed in the year of sale when the sales price equals or exceeds a taxpayer's undepreciated basis as of the beginning of said year, the taxpayer would, in effect, be recovering, tax free, more than the cost to him of the asset.

---

[7] Petitioner and respondent did not attempt to allocate the sales price between the land and the building, but did stipulate that "The selling price of the building and other depreciable assets comprising the [building] exceeded the adjusted basis of those assets [as of the start of the year in which they were sold]." These "other depreciable assets" consisted of alterations and improvements made to the building and additional equipment installed therein from 1951 to 1955 at a cost of $48,819.19. On the basis of estimated useful lives ranging from 10 to 20 years, petitioner had, as of the end of the fiscal year in which the sale occurred, claimed depreciation thereon totaling $29,011.44. The respondent did not make any adjustment or otherwise attempt to disallow the depreciation claimed on these "other depreciable assets" in the year of sale. There is nothing in the record to indicate that the amount received for these assets upon their sale exceeded the petitioner's adjusted basis therein. Thus, even if the portion of the sales price attributable to these "other depreciable assets" could be determined, there is no reason to believe that it would affect our finding that the amount received for the building upon its sale exceeded petitioner's adjusted basis therein as of the beginning of the fiscal year in which it sold the building. Aside from the foregoing, these "other depreciable assets" are of no relevance in these proceedings.

[8] This fact is of significance because, in his failure to do so, respondent violated his own regulations which specifically forbid the redetermination of salvage value merely to reflect changes in the current market value or even for other causes, except where there has been a concomitant redetermination of useful life (sec. 1.167(a)–1(c), Income Tax Regs.).

In making this argument, respondent relies upon *Cohn* v. *United States, supra; Randolph D. Rouse*, 39 T.C. 70 (1962); *Massey Motors* v. *United States*, 364 U.S. 92 (1960); and *Hertz Corp.* v. *United States*, 364 U.S. 122 (1960). Respondent's contention has, because of its simplicity, a beguiling appeal to it. However, a closer scrutiny of respondent's argument convinces us that it is incorrect for two reasons. First of all, the reasoning underlying respondent's position is unsound because it fails to take into account the distinction between (1) the concept of "depreciation" or the gradual exhaustion of property and (2) the concepts of "appreciation" or "depreciation" in the value of property because of market conditions such as scarcity, inflation, or the like. Moreover, respondent, in disallowing the depreciation deduction claimed by petitioner, has failed to comply with the underlying intent of section 167 and the specific provisions of his own regulations thereunder.

We find merit in petitioner's argument that the granting of a reasonable allowance for depreciation is a matter separate and distinct from the computation of gain upon the sale of property formerly held in the taxpayer's trade or business or for the production of income. The concepts of depreciation through the process of exhaustion, on the one hand, and of appreciation or depreciation because of market conditions, on the other hand, are mutually exclusive. Respondent, however, has sought to equate the two. The purpose of the depreciation allowance is to permit a taxpayer to recover, by deductions against his income, his cost or investment in any depreciable asset. *United States* v. *Ludey*, 274 U.S. 295 (1927). Depreciation, as that term is used in section 167,[9] occurs through use and the passage of time; such depreciation occurs regardless of market conditions which might otherwise enhance or diminish the value of an asset. In the instant case, the building continued to depreciate in petitioner's hands right up to the time of the sale. Respondent's contention that petitioner should be regarded as having recouped its investment in the building by its receipt of the sales proceeds and that petitioner is not entitled to a depreciation deduction in the year of sale is totally inconsistent with the specific design of the Internal Revenue Code of 1954. The 1954 Code contains two separate and distinct sets of provisions, each setting forth the particular tax consequences applicable to the separate and distinct phenomena of (1) depreciation through exhaustion and (2) increase or decrease in the value of an asset because of market factors. Thus, one set of provisions, section 167, permits, as a deduction against income, a reasonable allowance for the exhaustion, wear, and tear (including a reasonable allowance for obsolescence) of property used in

---

[9] Sec. 167(a) provides that there shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear, and tear (including a reasonable allowance for obsolescence) of property used in a business or held for the production of income.

the trade or business or held for the production of income. Gain or loss realized upon the sale or exchange of property as a result of market fluctuations is generally accounted for pursuant to section 1002 (recognition of gain or loss on the sale of property) and section 1231 (recognition of gain or loss on the sale of property used in the trade or business). This dichotomy in the tax consequences accorded to the realization of gains or losses due to market fluctuations, on the one hand, and the gradual loss of one's investment in an asset as a result of its exhaustion or wearing out, on the other hand, is specifically recognized in the respondent's regulations. See section 1.167(a)–8(a), Income Tax Regs., which provides in pertinent part:

(1) Where an asset is retired by sale at arm's length, recognition of gain or loss will be subject to the provisions of sections 1002, 1231, and other applicable provisions of law.

Respondent, by contending that petitioner has recovered the remaining portion of its cost or basis in the building upon its receipt of the sales proceeds, is, in a manner of speaking, attempting to recast into ordinary income, by way of disallowance through the depreciation provisions of section 167, a portion of the gain realized by petitioner upon the sale of the building (gain which, by the way, is in its entirety attributable to appreciation in value because of market conditions). This, we believe, is akin to trying to fit a square peg in a round hole.

The Second Circuit Court of Appeals in its very recent affirmance of a Memorandum Opinion of this Court in *Fribourg Navigation Co. v. Commissioner*, 335 F. 2d 15 (C.A. 2, 1964), appears to have equated the two concepts of depreciation through exhaustion and appreciation or depreciation in value because of market conditions in disallowing a depreciation deduction on a Liberty ship in the year of its sale. See *Fribourg Navigation Co. v. Commissioner, supra* at 16. However, it must be noted that that case presented an extremely difficult dilemma. For, under the facts of that case, there is some question that the taxpayer therein (1) had used inaccurate estimates in its depreciation schedule, despite the fact that the Internal Revenue Service had issued rulings accepting the estimates submitted by the taxpayer and (2) was therefore claiming depreciation on the vessel at a more rapid rate than actual depreciation was taking place. Although we do not agree with the rationale relied upon by a majority of the panel which decided that case, we, nevertheless, fully concur with their result for the following reason. It is true that part of the gain realized by the taxpayer on the sale of the vessel had resulted from market appreciation because of the Suez crisis. But it is also true that a portion of the gain realized may have resulted from the use of inaccurate estimates in the depreciation schedule and the claiming of excessive depreciation. There

is no indication, however, that the taxpayer carried its burden of proof as to the amount of gain due to market appreciation as contrasted with gain due to the claiming of excessive depreciation.[10]

A closer analysis of section 167 and the applicable regulations thereunder indicates to us that respondent, in disallowing the depreciation deduction claimed by petitioner, ignored the specific provisions of his own regulations, which we believe correctly interpret the statute.

Pertinent portions of the Income Tax Regulations provide (1) that the allowance for depreciation is the amount which should be set aside for the taxable year in accordance with a reasonably consistent plan, so that the aggregate of the amounts set aside, plus the salvage value of the property, will at the end of its estimated useful life to the taxpayer equal the cost or other basis of the property and (2) that an asset shall not be depreciated below a reasonable salvage value regardless of the manner employed in computing depreciation. Sec. 1.167 (a)–1(a), Income Tax Regs. The concept expressed in this regulation has received the approval of the Supreme Court in *Massey Motors* v. *United States, supra* at 107, and *Hertz Corp.* v. *United States, supra* at 126.

Respondent's disallowance of the depreciation deduction claimed by petitioner was based upon respondent's insertion into the depreciation equation of a known figure, the actual sales price for the building, in place of an estimated figure, the salvage value of the building. Whether the depreciation deduction on the building claimed by petitioner in the year of sale is to be allowed depends in this case upon the meaning of the term "salvage value."[11] Respondent equates this term with the amount actually received by petitioner upon the sale of its building. Petitioner contends, and this Court believes correctly so, that under the circumstances now before us, namely, where depreciable real property is unexpectedly disposed of substantially prior to

[10] The Second Circuit, in *United States* v. *Motorlease Corporation,* 334 F. 2d .617 (C.A. 2, 1964), reversing 215 F. Supp. 356 (D. Conn. 1963), a companion case to *Fribourg Navigation Co.* v. *Commissioner,* 335 F. 2d 15 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court, disallowed "On the authority of, and for the reasons given in *Fribourg Navigation Co.* v. *Commissioner*" the depreciation deductions claimed by the taxpayer, a corporation engaged in the business of leasing automobiles. The disputed deductions related to depreciation claimed on certain automobiles in the year they were sold. Similarly, although we do not agree with the rationale employed by the court therein, we agree with the result. There is no indication in that case that the excess of the sales price received over the estimate of salvage value resulted from an increase in market values. In fact, the opinion of the Court of Appeals therein suggests that this excess resulted from an inaccurate estimate.

[11] This is so because the aggregate depreciation claimed by petitioner on the building prior to the year in which it was sold, $755,099.89, was much less than its original cost in the building, $2,835,161.55. Thus, it follows that petitioner would be entitled to the depreciation deduction claimed unless the respondent may at this time, as he contends, substitute the amount received upon the sale of the building for the amount the petitioner, at the time he started to take depreciation on the building, estimated its salvage value would be a the end of its useful life.

the expiration of its estimated useful life, the actual sales price received therefor bears little, if any, relevance to the salvage value of the property. *S & A Co.* v. *United States*, 218 F. Supp. 677 (D. Minn. 1963). See also *Wyoming Builders, Inc.* v. *United States*, 227 F. Supp. 534 (D. Wyo. 1964); and *Kimball Gas Products Co.* v. *United States*, —— F. Supp. —— —— (W.D. Tex. 1962).

First of all, respondent's own regulations define salvage value as—

the amount (*determined at the time of acquisition*) *which is estimated will be* realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income and is to be retired from service by the taxpayer. *Salvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels. However, if there is a redetermination of useful life under the rules of paragraph (b) of this section, salvage value may be redetermined based upon facts known at the time of such redetermination of useful life.* * * *[Emphasis supplied. Sec. 1.167(a)–1(c), Income Tax Regs.][12]

Respondent has made no such redetermination of the useful life of the building as estimated by the petitioner, at least with respect to the year of sale in which year he sought to redetermine the salvage value of the building. Nor does respondent contend that any such redetermination was required. In fact, having in his possession all of the facts relating to the sale of the land and building, respondent (1) determined that, with respect to petitioner's fiscal year ended July 31, 1957, the year prior to that in which it sold the building, the useful life of the building to petitioner, for depreciation purposes, should have been 40 rather than 33⅓ years,[13] but (2) did not adjust salvage value for that year.

The essential concept underlying the depreciation allowance as set forth in section 167 is prediction or estimation. *Massey Motors* v. *United States, supra* at 105; and *Detroit Edison Co.* v. *Commissioner*, 319 U.S. 98, 101 (1943). The two vital factors necessary to the computation of the annual depreciation allowance are "useful life" and "salvage value," both of which are estimated figures. This is so (1) even though Congress has never undertaken to define either "useful life" or "salvage value," and (2) even though the latter term does not appear in the statute; for aside from the clear definitions of these terms in the respondent's regulations (which indicate that they are estimated figures, see sec. 1.167(a)–1 (b) and (c), Income Tax Regs.), the courts, upon numerous occasions, have expressly lent their stamp of approval to this underlying concept of prediction or estimation.

---

[12] It is to be noted that the present regulations under sec. 167, I.R.C. 1954, finally adopted June 11, 1956, 21 Fed. Reg. 3985 *et seq.*, differ materially from the proposed regulations published Sept. 28, 1954, 19 Fed. Reg. 6229, and those published Nov. 11, 1955, 20 Fed. Reg. 8454 *et seq.*, in that the *italicized* language in the above-quoted portion of the regulations did not appear in the proposed regulations.

[13] See fn. 2, *supra*.

Even in *Massey Motors* v. *United States, supra*, which respondent cites as authority for his position,[14] the Supreme Court, while emphasizing the essential integrity of the annual accounting period and the need for accuracy in computing the various factors involved in the depreciation equation, makes it patently clear that useful life and salvage value are to be estimates, rather than the actual amounts as determined from hindsight. Thus, the Supreme Court stated at pages 104, 105, and 107:

Obviously a meaningful annual accrual requires *an accurate estimation* of how much the depreciation will total. The failure to take into account *a known estimate of salvage value* prevents this, since it will result in an understatement of income during the years the asset is employed and an overstatement in the year of its disposition. * * *

Of course, there is a risk of error in such projections, but *prediction is the very essence of depreciation accounting*. Besides, the possibility of error is significantly less where *probabilities* rather than accidents are relied upon to produce what is hoped to be an accurate estimation of the expense involved in utilizing the asset. * * *

We therefore conclude that the Congress intended that the taxpayer should, under the allowance for depreciation, recover only the cost of the asset less the *estimated salvage, resale or second-hand value*. This requires that the useful life of the asset be related to the period for which *it may reasonably be expected to be employed in the taxpayer's business*. Likewise salvage value must include *estimated resale or second-hand value.* * * * [Emphasis supplied.]

See also *Cohn* v. *United States, supra* at 377, where it is stated: "Useful life is necessarily an estimate made at the time when the property is first put to its business use." Necessarily, salvage value is also an estimate made at the time when the asset is first subject to a depreciation allowance. *Burnet* v. *Niagara Brewing Co.*, 282 U.S. 648 (1931); and H. Rept. No. 1337, *supra* at 22.

Respondent has not been able to show us, nor has this Court been able to find, any cogent authority permitting respondent to depart from the use of estimates and to equate salvage value with the actual sales price received in a situation where depreciable real property is unexpectedly sold substantially prior to the expiration of its estimated useful life (which in this instance is the full physical life of the property) and where, as here, there has been no determination that useful life or salvage value had been incorrectly determined. Although respondent did not specifically call to our attention section 1.167(b)–0(a) of the Income Tax Regulations, it is obvious from the decisions cited in his brief (*Randolph D. Rouse, supra* at 77, and *Cohn* v. *United States, supra* at 379) that he regards that regulation

---

[14] The Supreme Court, in *Massey Motors* v. *United States*, 364 U.S. 92 (1960), held that where a taxpayer, at the time he acquires an asset, reasonably expects that he will use it for a period less than its physical or economic life, he may not, for purposes of computing the depreciation allowance, employ a useful life based on the physical life of the asset, but must employ a useful life based upon the period of its expected usefulness to him.

as providing such authority.[15] Respondent's position appears to be that the reasonableness of petitioner's claim for depreciation for its fiscal year ended July 31, 1958 (the year in which it sold the building), should be based upon conditions known to exist at the end of its fiscal year. In respondent's view, these conditions are that petitioner had sold the building during that year for an amount in excess of its adjusted basis therein; that it had thereby recouped its investment therein; and that petitioner had thus not incurred 'any depreciation in the year of sale. We believe that our remarks hereinbefore made concerning respondent's failure to distinguish between the concept of depreciation through exhaustion and the concept of appreciation or depreciation because of market conditions sufficiently answer this argument. Moreover, it appears to us that respondent is "reading too much into" section 1.167(b)–0(a) of the Income Tax Regulations.[16] Under the system of depreciation provided for in section 167, as implemented by the applicable Income Tax Regulations, the depreciation allowance is estimated or approximated while property is used in the trade or business or held for the production of income. At the end of each such taxable year while the property is so held, any errors or miscalculations in the estimates of useful life and salvage value may be corrected on the basis of information known at the end of such year. At the time the property is sold, the amount of gain or loss which may have occurred because of market conditions will be picked up by virtue of the provisions of sections 1002, 1231, or other applicable provisions of law.

The Supreme Court in *Massey Motors* v. *United States, supra* at 105, was careful to note that the real salvage price and the actual duration of use of depreciable property are relevant and may be used in connection with the correction of a depreciation base only where it appears that a miscalculation has been made. The respondent has made

---

[15] Sec. 1.167(b)–0(a), Income Tax Regs., provides:
"Any reasonable and consistently applied method of computing depreciation may be used or continued in use under section 167. Regardless of the method used in computing depreciation, deductions for depreciation shall not exceed such amounts as may be necessary to recover the unrecovered cost or other basis less salvage during the remaining useful life of the property. The reasonableness of any claim for depreciation shall be determined upon the basis of conditions known to exist at the end of the period for which the return is made. * * * "

[16] We believe that a careful examination of sec. 1.167(b)–0(a), Income Tax Regs., indicates that it is merely a general provision which does not confer such authority, especially in light of the more specific portions of the regulations explicitly (1) forbidding redetermination of salvage value after the time of acquisition of the asset merely because of changes in price levels and (2) providing for determination of salvage value *only* if the Commissioner is permitted to redetermine, and does in fact redetermine, "useful life." See sec. 1.167(a)–1(c), Income Tax Regs. When that portion of the regulations setting forth the conditions under which "useful life" may be redetermined is examined, it becomes clear that the Commissioner is authorized to redetermine merely the "estimated remaining useful life" of the asset and not to reject a reasonable estimate in favor of a known factor, i.e., the period during which the asset was actually held. Sec. 1.167(a)–1(b), Income Tax Regs.

no determination that the original estimate as to the useful life or salvage value was inaccurate.[17]

Possibly there is one situation where the actual sales proceeds received for depreciable property may be of some relevance in determining whether salvage value has been correctly estimated. That would be where such property is sold at or near the end of the period during which a taxpayer estimated the property would be used by him, viz, its useful life to the taxpayer. This is exactly what occurred in *Cohn* v. *United States, supra;* [18] *Edward V. Lane*, 37 T.C. 188 (1961); *Wier Long Leaf Lumber Co.*, 9 T.C. 990, 997–999 (1947) (insofar as the sawmill property was concerned), reversed on another issue 173 F. 2d 549 (C.A. 5, 1949); *Fribourg Navigation Co.* v. *Commissioner, supra;* and *United States* v. *Motorlease Corporation, supra.* The amount received upon the sale of property at or near the end of its useful life to the taxpayer may be a relevant yardstick for purposes of determining salvage value (assuming, of course, the taxpayer fails to establish that all or some specific portion of the sales proceeds resulted from market appreciation, rather than excessive depreciation). However, the amount received upon the sale of the property here in question having a useful life to the petitioner of 33⅓ years but which had been actually held for less than one-third of that period, would seem to have little relevance to the amount the property would bring at the end of its useful life, which in this case, as we have noted, was the

---

[17] This Court has, upon occasion, in denying a depreciation deduction for an asset in the year of its sale, indicated that "no consideration was given to the salvage value," when the taxpayer therein originally estimated the proper depreciation schedule. See *Randolph D. Rouse*, 39 T.C. 70, 76 (1962). See also *Edward V. Lane*, 37 T.C. 188, 194 (1961); and *Cohn* v. *United States*, 259 F. 2d 371 (C.A. 6, 1958). To the extent those cases meant that no consideration had been given to salvage value as a matter of oversight and found that the actual sales price of the asset was relevant to the salvage value for purposes of correcting a mistake or miscalculation in the depreciation equation, they are distinguishable from the instant proceedings. For here, the petitioner considered the salvage value of the buildings, and using its sound business judgment, which respondent does not dispute, determined that, at the end of its estimated useful life the building would have a zero salvage value. The petitioner expected that it would use the building for its full physical or economic life. The respondent does not contest this point. Nor has any evidence been presented that the building had a shorter useful life to petitioner than petitioner had estimated. Although the petitioner had substantially renovated the building subsequent to its acquisition, nevertheless the structural steel frames, foundations, basement, and brick exterior walls were retained. Elevators were installed, but they were of the type that required attendants for operation. As thus renovated, the building was not of a character comparable to a fully modern office building. At the expiration of the estimated useful life, the structural frames, foundations, basement, and exterior brick walls would have been more than 78 years old. The respondent has nowhere objected to the petitioner's determination that under these circumstances the salvage value of the building at the expiration of its useful life would be zero. The petitioner's estimation of salvage value was therefore a reasonable one.

[18] The Court of Appeals in the *Cohn* case was extremely explicit in defining the scope of the question before it. It stated (p. 378):

"In so far as this case is concerned the issue is whether salvage value can be adjusted at or near the end of the useful life of the asset when it is shown by an actual sale of the asset that there is a substantial difference between what was estimated and what it actually is. * * *"

full physical life of the building. The only condition under which the actual sales price would be relevant to salvage value would be if useful life could be equated with the period for which the taxpayer actually held the property at the time of its sale. In our opinion, however, the concept of "useful life" is entirely different from that of "the actual holding period." See the dissenting opinion in *Massey Motors* v. *United States, supra*, where Mr. Justice Harlan noted at page 113:

> In examing the cases, it must be borne in mind that even the Commissioner does not contend that a taxpayer who *happens* to dispose of some asset before its physical exhaustion must depreciate it on [the basis of] a useful life equal to the time it was actually held. It is only when the asset "may reasonably be expected" to be disposed of prior to the end of its physical life that the taxpayer must base depreciation on the shorter period. * * *

Similarly, the concept of "salvage value" as employed in connection with the depreciation allowance is totally different from "the amount received upon the sale of an asset," except where the asset is sold at or near the end of its useful life. Cf. *Cohn* v. *United States, supra*, and *Edward V. Lane, supra*. To the extent that the decision of this Court in *Randolph D. Rouse, supra*, is inconsistent with this principle, we decline to follow it.

The enactment in 1942 of the predecessor of section 1231 would appear to have been the primary factor prompting respondent to disallow as a matter of general practice depreciation deductions claimed in the year of sale with regard to property sold at a price in excess of (but not less than) a taxpayer's undepreciated basis therein at the beginning of the year of sale. The predecessor of section 1231 changed existing law to the extent that gain realized upon the sale or exchange of a depreciable asset held in excess of 6 months was treated as capital gain, rather than ordinary income. Although, prior to the enactment of the predecessor of section 1231, respondent had specifically taken the position that a taxpayer must continue to depreciate an asset up to the time of its sale (see *Herbert Simons*, 19 B.T.A. 711, 713–714 (1930) ; see also *Even Realty Co.*, 1 B.T.A. 355 (1925) ; and *Capital City Investment Co.*, 4 B.T.A. 933 (1926)), he changed his position shortly thereafter (see *Wier Long Leaf Lumber Co., supra*) when the opportunities for tax avoidance under the new statutory provision became evident. Tax avoidance could be effected under the law (as it existed prior to December 31, 1962, in the case of *personal property*, and prior to December 31, 1963, in the case of *real property*) if an asset were depreciated more rapidly than its actual rate of exhaustion. See the comments of the Supreme Court in *Massey Motors* v. *United States, supra* at 97, relating to this abuse. Under the law, as it existed prior to the above-mentioned dates, if a taxpayer sold an asset after

depreciating it faster than actual exhaustion occurred, he was able, in effect, to convert ordinary income into capital gain (at least where depreciable property had been held by the taxpayer for more than 6 months). This was possible because the depreciation allowance constitutes a deduction against ordinary income and, at the same time, correspondingly reduces the taxpayer's basis in the property, thereby increasing the potential gain realizable upon the sale or exchange of such asset. Such gain, prior to the Revenue Acts of 1962 and 1964, was taxable as capital gain. See sec. 1231, and sec. 167(a)–8(a), Income Tax Regs.

We do not believe that the mere enactment of the predecessor of section 1231, which simply provided that gains on the sale or exchange of depreciable property held for more than 6 months would be considered as capital gains, also changed in any way the previously existing statutory scheme providing for (1) the depreciation of an asset up to the time of sale and (2) the taxation of any gain or loss realized upon the sale of such an asset, as a result of market conditions, pursuant to the applicable provisions relating to gain or loss.

Congress and the Treasury Department have, at least since 1947, been well apprised of the revenue losses resulting from the allowance of depreciation deductions at a more rapid rate than the actual exhaustion of the property involved. See *Evans* v. *Commissioner*, 264 F. 2d 502, 513–514 (C.A. 9, 1959), reversing a Memorandum Opinion of this Court, reversed sub nom. *Massey Motors* v. *United States*, *supra*, for a summary of the various legislative proposals to curb this abuse; and S. Rept. No. 1881, to accompany H.R. 10650 (Pub. L. 87–834), 87th Cong., 2d Sess., p. 95 (1962). However, it was not until 1962 that Congress prospectively enacted legislation aimed at preventing taxpayers, at least with respect to *personal property* used in the trade or business or held for the production of income and later sold, from converting ordinary income into capital gains by virtue of excessive depreciation deductions. See sec. 1245.[19] The Revenue Act of 1964 added a somewhat similar provision with respect to real property. See sec. 1250.[20] Obviously, neither Congress nor the Treasury believed that respondent possessed adequate means to prevent taxpayers from converting ordinary income into capital gain prior to the enactment of this legislation.

Because of this legislation, the potentiality of abuse theretofore inherent in the depreciation provisions has been curbed as of Jan-

---

[19] In essence, sec. 1245 has modified sec. 1231 to the extent that, upon the sale or exchange of depreciable personal property, the lower of (1) the aggregate amount of depreciation deductions previously claimed or (2) the gain realized will be treated as ordinary income.

[20] In essence, sec. 1250 has modified sec. 1231 to the extent that upon the sale or exchange of depreciable real property, there shall be taxed as ordinary income the lower of (1) the gain realized or (2) the amount by which *accelerated* depreciation taken exceeds the amount of straight-line depreciation that would have been allowable.

uary 1, 1963, in the case of personal property and as of January 1, 1964, in the case of real property. The position taken by respondent whereby he disallowed, in the year of sale, any depreciation deduction (in excess of the amount by which the adjusted basis of the asset at the beginning of the year exceeds the amount realized upon the sale) can best be characterized as an administrative shortcut relied upon by respondent to recapture, to some extent in the year of sale,[21] excessive depreciation deductions taken as a result of the use of inaccurate estimates.

Under the circumstances now before us, not only does it appear that respondent's action lacks authorization either in the statute or his own regulations, but it also seems that his action was misdirected. For there was no element of abuse or tax avoidance in the depreciation claimed by petitioner. Respondent had no question regarding the useful life of the building. Nor is there any indication that depreciation was taken on the building at a faster rate than the actual exhaustion of the building was occurring. Moreover, the parties have stipulated that during the period between 1949, when the renovation of the building was completed, and the date of its sale in 1958, the market value of rental property in downtown Portland, where the building was situated, "increased substantially."

For these reasons, we believe petitioner should prevail.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

TIETJENS, *J.*, dissents.

———

WITHEY, *J.*, concurring: I concur in the result reached herein. In my view this case is distinguishable on its facts from either *United States* v. *Motorlease Corporation*, 334 F. 2d 617 (C.A. 2, 1964), reversing 215 F. Supp. 356 (D. Conn. 1963), or *Fribourg Navigation Co.* v. *Commissioner*, 335 F. 2d 15 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court, and is not controlled by those cases. A deduction for depreciation, provided for the first time in sections IIB and IIG(b) of the Revenue Act of 1913 and presently authorized by section 167 of the Internal Revenue Code of 1954, is one of the few, if not the only, provisions of the tax law wherein Congress has given statutory voice to a principle of cost accounting, i.e., that the annual expense of doing business should be an offset against the ordinary income produced by that business. Courts have many times in enunciating the philosophy of depreciation used the following language in

---

[21] The correction sought to be effected by respondent was, to some extent, limited because respondent believed that, pursuant to certain decisions, he was not permitted to disallow depreciation claimed in any year other than the year of sale, even though there may have been prior "open" years. See *Cohn* v. *United States, supra.*

one form or another: The annual deduction for depreciation together with annual deductions throughout the useful life of an income-producing asset should equal at the end of its useful life its cost basis less the salvage value thereof in order that the taxpayer may be able to *recover* that basis and have enough set aside to then replace the wornout asset. In my view the key to the instant issue lies in the proper understanding of the word "recovery" as so used. What is actually meant in its use and what Congress intended in allowing a deduction for depreciation was that a recovery be made of the cost of such an asset *tax free* as an offset against *ordinary income*. To refuse to permit a taxpayer to take a proportionate deduction for depreciation in the year of sale of an income-producing asset is to vitiate congressional intent, for a portion of its cost can *never* then be recovered, for it may then never be an offset against ordinary income but may only be an offset against capital gain resulting from a sale or exchange thereof.

———

PIERCE, *J.*, dissenting: I believe that this Court, in deciding the instant case, should have followed the two recent decisions of the Court of Appeals for the Second Circuit in *Fribourg Navigation Co.* v. *Commissioner*, 335 F. 2d 15, affirming a Memorandum Opinion of this Court; and *United States* v. *Motorlease Corporation*, 334 F. 2d 617, reversing 215 F. Supp. 356 (D. Conn.). These cases were decided on the same date (July 15, 1964) by two completely different panels of judges; and the basic issue in each was, in my view, indistinguishable from that here involved.

The two panels, after considering the controlling statutes, the pertinent Income Tax Regulations, and various conflicting judicial views (including those upon which the majority of this Court here relies) each approved the position of the Internal Revenue Service, which was first accepted in 1958 by the Sixth Circuit in *Cohn* v. *United States*, 259 F. 2d 371, and which decision has recently been followed by the District Court for the Eastern District of Tennessee in *Killebrew* v. *United States*, 234 F. Supp. 481, (1964), with respect to depreciation on real estate improvements in the year of sale. The basic principle thus approved is, in substance, that a taxpayer may not depreciate property for the year of its sale, to a point where the adjusted basis thereof would go below the "salvage value" established by the price for which such property was sold in that year.[1]

For this Court, almost immediately following the affirmance of our

[1] The result in the *Fribourg* case where the property was sold at a large profit which greatly exceeded the adjusted basis at the beginning of the year was that no depreciation for the year of sale was allowed; and that in the *Motorlease* case, only a limited amount of depreciation for the year of sale was allowed.

decision in the *Fribourg* case (see also our decisions in *Randolph D. Rouse*, 39 T.C. 70; and *Edward V. Lane*, 37 T.C. 188) and in the absence of any contrary Court of Appeals authority, to now refuse to follow the above basic principle which was applied both by the Sixth Circuit and by both panels of the Second Circuit, is in my view extraordinary to say the least.

RAUM, MULRONEY, and SCOTT, *JJ*., agree with this dissent.