John P. Vidican and Violet Vidican v. Commissioner.
Vidican v. Commissioner
Docket No. 778-67.
United States Tax Court
T.C. Memo 1969-207; 1969 Tax Ct. Memo LEXIS 89; 28 T.C.M. (CCH) 1099; T.C.M. (RIA) 69207; October 6, 1969, Filed Ernest R. Mortenson, for petitioner *90 Violet Vidican. Richard G. Daly, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in petitioners' income tax in the following amounts: Year
Deficiency
1962
$32,777.17
1963
9,808.79
1964
13,684.65 Three issues are presented. The first concerns the proper tax treatment of the gains realized from the sale of certain apartment units by petitioners during the years in question, which turns on whether the apartment units were "property held * * * primarily for sale to customers in the ordinary course of * * * trade or business" or capital assets within the meaning of section 1221, I.R.C. 1954. The second issue concerns the propriety of depreciation deductions for certain of the unsold apartment units. The third issue, raised by an amendment to the petition, concerns depreciation deductions for the year of sale, which were unclaimed in petitioners' returns. Findings of Fact Petitioners, now divorced, were husband and wife during the tax years 1962-1964, and filed joint income tax returns for each of those years with the district director of internal revenue at Los *91 Angeles. At the time the petition herein was filed the husband's address was P.O. Box 1235, Arcadia, California, and the wife's address was 366 Fairview Avenue, Arcadia, California. Petitioner John Vidican ("Vidican") was licensed as a general contractor and was also licensed as a plumbing contractor, heating contractor and air conditioning contractor. For a period of a number of years beginning around 1950 and continuing through 1964, Vidican would acquire land, and, as general contractor, would build a small apartment house thereon. Generally, he and his family would move into one of the apartments. After the remaining apartments were rented, he would sell the completed property at a substantial profit, and then move into another apartment building constructed by him which had only recently been completed. Vidican's first venture into a somewhat similar type of operation occurred prior to 1950 and involved a motel rather than an apartment building. It was located on Washington Boulevard in Los Angeles. Vidican, as general contractor, built the motel in partnership with his father-in-law, Louis Mesaros. Both the Vidican and Mesaros families lived in the motel. It was sold in 1949. *92 The following table sets forth certain information with regard to all of the apartment buildings built and owned by Vidican (including the ones involved herein) in the years 1950-1964: 1100 Address of
Date land
Date of
Number of
Date of
Date of
property
purchased
building permit
Units
Completion
Sale
1.1150 O
10
1951
9/22/53
Los Angeles,
California
2. 3414 Overland,
(Not
(Not
6
3/21/53
4/4/55
available)
available)
Los Angeles,
California
3. 3365 Overland,
7/20/53
(Not
12
4/24/54
11/30/54
available)
Los Angeles,
California
4. 1131 West
3/25/54
11/3/54
16
4/10/56
10/5/57
Duarte Road
Arcadia,
California
5. 759 Fairview
9/4/56
11/1/56
12
8/20/57
7/30/58
Avenue
Arcadia,
California
6. 212 Bonita,
1/16/58
2/11/58
8
8/1/58
10/16/61
Arcadia,
California
7. 219
5/5/58
9/19/58
8
5/13/59
11/29/61
California,
Arcadia,
California
8. 1122
12/14/59
3/30/60
12
4/10/61
Various
Huntington Drive,
Arcadia,
California *
9. 1124
12/14/59
3/30/60
12
4/10/61
Various
Huntington Drive,
Arcadia,
California
10. 763 Arcadia
12/1/59
3/30/60
12
5/17/61
Various
Avenue,
Arcadia,
California
*93 All of the above apartment buildings were built by Vidican as general contractor with the help of Mesaros and a small building crew. As a general rule, Vidican and Mesaros would purchase lots near each other, and they would build an apartment building on each lot, at times as partners. Vidican and his family lived in various of the above apartment buildings until the time of their sale, namely at 1150 South Burlington, at one of the buildings on Overland, at 1131 West Duarte, at 759 Fairview, at 212 Bonita, at 219 California, and at 763 Arcadia. Each of the first seven apartment buildings listed in the table above was sold as a unit. In some cases the buildings were listed for sale with real estate brokers. In each case the building was fully rented at the time of sale. It is easier to sell an entire apartment building as a single unit when all the apartments in it are rented. The properties involved in the present case were located at 1122 and 1124 Huntington Drive and 763 Arcadia Avenue - all in Arcadia, California. The land relating to all three of these *94 properties was purchased in December, 1959. The land at 1122 was purchased by Mrs. Vidican's parents and the other two parcels by Vidican. Vidican as general contractor completed construction of a 12-unit apartment building on each of the three parcels in the spring of 1961. As set forth in the table above, the buildings on the Huntington Drive properties were completed on April 10, and the building on Arcadia Avenue was completed on May 17. Some attempts were made to rent the apartments in the three buildings, but only four or five apartments in each building were rented. One apartment unit at 763 Arcadia was rented throughout the years in issue. Attempts to sell the entire properties as units were unsuccessful. On June 12, 1961 Vidican purchased the interest of his parents-in-law in 1122 Huntington Drive. He had meanwhile become aware of the condominium laws of California, and sought and obtained permission to sell the apartment units on an individual basis. [1] This enabled him to sell individual unrented apartments without the necessity of attempting to rent them as would be the case if he were to obtain the best price upon sale of the apartment house as a whole. The application *95 for permission to sell separate apartment units with respect to 1124 Huntington Drive was dated August 30, 1961, and permission was granted October 18, 1961. The application for 1122 Huntington Drive was dated December 6, 1961, and permission was granted February 9, 1101 1962. Similar data with respect to the Arcadia Avenue property do not appear in the record. Vidican advertised these units for sale in local newspapers; an advertisement for 1122 Huntington Drive appeared in a newspaper dated November 11, 1961. The newspaper advertisements contained two telephone numbers; one was for the Vidicans' apartment at 763 Arcadia, and the other was for an office maintained by Vidican and Mesaros in one of the apartment buildings; the advertisements further gave specified office hours. *96 The following table shows the number of units sold and the gain realized thereon as reported on petitioners' return and undisputed by the Commissioner: No. of
Year
Units
Gain
1122-1124
Huntington
1962
19
$108,701.81
1122-1124
Huntington
1963
4
21,766.24
763
Arcadia
1963
3
14,945.37
1122
Huntington
1964
1
52,304.21
763
Arcadia
1964
6
The record in this case contains petitioners' Federal income tax returns for 1957-1964. These returns disclose the following information concerning the sources of petitioners' income: Dividends
Net Income
(prior to
Net
From
dividend
rental
Year
Contracting
exclusion)
Interest
income
1957
None
$ 1,340.00
$ 1,089.05
$21.78
1959
None
2,081.07
585.64
1,286.97
1960 *
$6,447.06
3,033.16
166.55
2,631.09
1961
137.27
2,109.50
90.00
(19,39 4.51)
1962
None
2,432.00
92.85
(29,614.19)
1963
2,559.00
5,839.84
416.70
(14,347.69)
1964
None
4,471.00
5,860.38
(110.07)
TOTALS
$9,143.33
$24,121.57
$10,398.74
($62,012.45)
Capital gains
and losses
(prior to
capital gain
deduction)
Apartment
Other prop-
houses and
erty (pri-
apartment
marily sec-
Other
Year
units
urities)
Income
1957
$ 19,915.44
($ 2,270.58)
None
1959
12,317.89
26,334.44
20.00
1960 *
None
(11,001.37)
None
1961
34,269.16
3,327.87
None
1962
108,701.81
(7,075.32)
None
1963
36,711.61
54,744.55
261.37
1964
52,304.21
40,252.97
133.58
TOTALS
$298,393.58
$110,173.03
$444.95
*97 On their joint returns for the years in question, petitioners treated the gain from the sales of apartment units as long-term capital gain. In his deficiency notice, the Commissioner determined that the gain was taxable as ordinary income because the properties were held for sale in the ordinary course of petitioners' trade or business. On their joint returns petitioners took the following depreciation deductions with regard to the apartment units in question: Year
Properties
Building
Furnishings
Total
1962
763 Arcadia - 12 units
$4,875.17
$580.48
$5,455.65
1963
763 Arcadia - 9 units
3,292.14
435.35
3,727.49
1964
763
Arcadia -
309.21
48.37
1 unit
357.58
Depreciation on the building was computed by the double declining balance method with a 33 1/3 year life and no salvage value; depreciation on the furnishings was computed by the straight line method with a 10 year life and no salvage value. Petitioners claimed no depreciation deductions during the years involved with respect to the Huntington Drive properties, *98 [2] nor did they claim depreciation for Arcadia Avenue apartments in the year of sale. In his notice of deficiency, the Commissioner disallowed these deductions in their entirety on the ground that the property was held primarily for sale. At trial, the Commissioner conceded that deductions for depreciation of one apartment unit at 763 Arcadia for each of the years in issue were properly taken. 1102 Apart from that apartment the record does not disclose whether any patricular apartment in the properties involved was in fact rented during the taxable years. In the amendment to their petition, petitioners stated in part: Respondent has erroneously failed to give credit for depreciation for the years 1962, 1963 and 1964 in the year of sale of the depreciable assets. * * * * * * It is contended that under the proper interpretation of the provisions of the Internal *99 Revenue Code, depreciation should have been allowed on the depreciable assets for the year of sale. Opinion RAUM, Judge: 1. Capital gain v. ordinary income. - During the years in issue, petitioners sold 33 apartment units and realized a total gain of $197,717.63, which they reported as capital gain on their income tax returns for those years. The Commissioner determined that the gain constituted ordinary income. The issue turns on the much-litigated question of whether an item sold is a "capital asset" (as urged by petitioners) or "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" (as urged by the Commissioner) within the meaning of section 1221. If the apartment units were capital assets, the treatment of gain realized upon their sale is governed by sections 1201 and 1202. If not, the gain represents ordinary income under section 61. The question is entirely factual, so that each case must be examined in light of its own peculiar circumstances. S. O. Bynum, 46 T.C. 295, 299. While the courts have examined many factors in these cases (see, e.g., Robert W. Pointer, 48 T.C. 906, 915-916), *100 no one factor is determinative. Ralph J. Oace, 39 T.C. 743, 747. For property to be held primarily for sale to customers in the ordinary course of the taxpayer's trade or business, it must be held principally for such purpose. Malat v. Riddell, 383 U.S. 569. It would serve no useful purpose in this case to indulge in a detailed analysis of all the factors involved or of the many cases in this area. While there are certain factors here that might support the position of each party, it is our conclusion on the balance of all the evidence, and we so find as a fact, that the apartment units sold were held primarily for sale to customers in the ordinary course of petitioners' trade or business. From 1950, Vidican followed a pattern of purchasing land, constructing an apartment building thereon, moving into the building with his family (in most cases), renting apartments until the building was full, and finally selling the property. These ventures were often undertaken in conjunction with his father-in-law. Taken together, these activities constitute a trade or business *101 on the part of Vidican of building and selling apartment properties. With respect to the three properties involved in this case, Vidican sold individual apartments, but his business was essentially that of building and selling the completed properties. The particular method chosen was merely the one thought to be the most advantageous in the circumstances. An analysis of the petitioners' income form 1957-1964 shows clearly that they relied on the sale of apartment properties rather than on rentals for the great bulk of their income. The rental activities in fact reflected losses, often substantial, for most of those years. Vidican's contracting activities, apart from the construction of his own apartment buildings, appear to have been comparatively negligible, and the remainder of petitioners' income virtually all arose from passive investments (primarily in securities). Vidican's trade or business from 1950 through the years in issue was that of building and selling apartment properties. His activities with regard to the three properties here involved support this position. The three buildings were completed in April and May of 1961, and by the end of August 1961 Vidican had applied *102 for permission to sell the apartment units at 1124 Huntington Drive. The apartments at 1122 Huntington Drive were advertised for sale as condominiums even before application for permission to make such sales had been made. Vidican and his father-in-law maintained an office and regular office hours to handle the condominium sales. Petitioners argue that the three properties were sold only because of difficulties in renting the apartment units and that they were merely "liquidating" an unprofitable investment. Petitioners' pattern of conduct over a number of years, however, was to rent apartments until full and then to sell the entire property. Their rental activities 1103 produced losses in most years, and it is clear that petitioners relied on sales rather than on rentals to produce income. In the case of the three properties here involved, the difficulty in renting may have determined the method of sale - i.e., sale of individual apartments rather than sale of the entire only when fully rented. It is noteworthy that only three or four months elapsed between the completion of the buildings and the first application for permission to sell condominiums. Petitioners further argue *103 that the sales of the first seven apartment buildings were occasioned by personal reasons, such as a desire to be closer to schools, problems with damp climate, difficulties with a swimming pool, a desire for larger quarters, and business problems between Vidican and his father-in-law. While it may be that these purposes were served by selling the properties and moving to new ones, we are convinced that they were not the motivating reasons for the sales. The sales were made to produce income and were part of a pattern. Petitioners were in the business of building and selling apartment properties during the years in issue. This conclusion is supported both by their similar activities in the past and by their actions with regard to the apartment units here involved. These units were (with one exception above noted) held for sale to customers in the ordinary course of petitioners' trade or business, and the gain from the sales thereof must be treated as ordinary income. 2. Depreciation deductions. - On their returns for the years in issue, petitioners deducted depreciation on those apartment units at 763 Arcadia and their furnishings that had not been sold by the end of the respective *104 years. The Commissioner disallowed these deductions on the ground that the apartments were held primarily for sale, but at trial conceded that deductions for the one apartment unit at 763 Arcadia rented throughout the years in issue were improperly disallowed. In an amendment to their petition, petitioners claimed depreciation deductions for the properties in the year of sale. Section 167(a) provides for the allowance "as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income." It is well settled that such a deduction is not allowable with respect to property held for sale in the ordinary course of business. See, section 1.167(a)-2, Income Tax Regs.; Luhring Motor Co., 42 T.C. 732, 751; Duval Motor Co., 28 T.C. 42, 53, affirmed 264 F. 2d 548 (C.A. 5); Latimer-Looney Chevrolet Inc., 19 T.C. 120, 125-126; The Munising Motor Co., 1 B.T.A. 286, 289. *105 In view of our holding above that the apartment units for which depreciation was claimed during the years in issue were held during those years for sale to customers in the ordinary course of petitioners' trade or business, we must conclude that the claimed depreciation deductions were properly disallowed. The year-of-sale depreciation deductions claimed in the amendment to the petition must similarly be disallowed. Furthermore, even if the apartment units were held for purposes that would make depreciation deductions in general proper, we think that in the circumstances here involved the doctrine of Massey Motors Inc. v. United States, 364 U.S. 92, would preclude the depreciation deductions claimed in petitioners' returns and amended petition. In Massey Motors, the Supreme Court said (p. 93): We have concluded that the reasonable allowance for depreciation of the property in question used in the taxpayer's business is to be calculated over the estimated useful life of the asset while actually employed by the taxpayer, applying a depreciation base of the cost of the property to the taxpayer less its resale value at the estimated time of disposal. (Emphasis supplied. *106 ) The Court further stated (p. 105): Moreover, under a system where the real salvage price and actual duration of use are relevant, to further insure a correct depreciation base in the years after a mistake has been discovered, adjustments may be made when it appears that a miscalculation has been made. In the present case, at least by the beginning of 1962, it was apparent both that the useful lives of the buildings and furnishings in petitioners' hands were not going to be 33 1/3 and 10 years, respectively, and that, far from being nothing, the 1104 "salvage" [3] value, or resale price, of the buildings and furnishings was going to be in fact far in excess of their cost. Petitioners were required to use this salvage value in computing depreciation, and, while the sale price might not have been precisely determinable, it was clear that it would exceed the cost of the property. Thus no amount would be allowable as a depreciation deduction. *107 Nothing in the Supreme Court's opinion in Fribourg Navigation Co. v. Commissioner, 383 U.S. 272, is contrary to this result. That case expressly reaffirmed the holding of Massey Motors. See 383 U.S. at 277. Fribourg involved a case where the original estimates of useful life and salvage value were reasonable when made, but where the asset involved was sold for a large gain because of an unexpected sudden and dramatic rise in the market. At the time the asset was acquired, the sale was not anticipated. The Court allowed depreciation based on the original estimates of useful life and salvage value in the year of sale, but stated (p. 277): It is, of course, undisputed that the Commissioner may require redetermination of useful life or salvage value when it becomes apparent that either of these factors has been miscalculated. The fact of sale of an asset at an amount greater than its depreciated basis may be evidence of such a miscalculation. See Macabe Co., 42 T.C. 1105, 1115 (1964). But the fact alone of sale above adjusted basis does not establish an error in allocation. That is certainly true when, as here, the profit on sale resulted *108 from an unexpected and shortlived, but spectacular, change in the world market. Petitioners have not shown that this case involved such an unexpected change in the market or that this case is more like Fribourg than like Massey Motors. Unlike Fribourg and Macabe Co., 42 T.C. 1105, 1109, there is nothing in the present case to show that the high salvage value (measured by the amounts obtained on sale) was attributable in any part to appreciation in value during the period that the property was held for sale - a consideration that must not affect the amount of depreciation otherwise allowable. Moreover, to the extent that Fribourg may be thought to support a deduction for depreciation in the year of sale, it is inapplicable here, because it is based upon the assumption that depreciation would otherwise be deductible in other years, an assumption that we have determined to be unfounded on the facts of this case. Decision will be entered under Rule 50. Footnotes
*. This property was originally owned by Mesaros and his wife, and was deeded over to the Vidicans on June 12, 1961.↩
1. The testimony on behalf of petitioners refers to the individual units as "condominiums," whereas the Government challenges the use of this term and refers to the units as "cooperatives." Although the difference may be signficant for some purposes, nothing in the present case appears to turn upon which label accurately describes these units, and we shall for convenience refer to them as "condominiums" without any determination as to which designation is the more accurate.↩
*. The figures represent the combined amounts reported on the separate returns filed by Mr. & Mrs. Vidican for 1960.↩
2. Petitioners did claim a depreciation deduction for the Huntington Drive apartments on their 1961 return. The computations of gains from the sales of these apartments in subsequent years contain only the 1961 depreciation figures (in aliquot portions) under a column entitled "Depreciation allowed (or allowable)."↩
3. The term "salvage" as used in this connection is a euphemism. It does not refer to junk value; rather, it refers to actual resale value of property that still has a substantial remaining useful life after the intended sale by the taxpayer.↩