RAY CLYMER, JR. and DENISON POULTRY & EGG CO., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Clymer v. Commissioner
Docket Nos. 9138-79, 9139-79.
United States Tax Court
T.C. Memo 1984-203; 1984 Tax Ct. Memo LEXIS 476; 47 T.C.M. (CCH) 1576; T.C.M. (RIA) 84203; April 23, 1984. *476 Clymer was the sole stockholder and chief executive officer of Denison, a Coors beer distributor in northern Texas. In 1970 Clymer entered into an oral agreement with Denison under which he received a salary of $27,000 a year plus 20 percent of the net profits before taxes of Denison. Held: Amounts paid to Clymer in 1974, 1975 and 1976 under the contingent compensation agreement exceeded reasonable compensation for his services. Reasonable compensation determined. Held,Further:Denison may not deduct expenses of operating airplanes owned by it primarily for business purposes attributable to Clymer's personal use of the planes even though Clymer paid hourly rental for use of the planes. Held,Further: Salvage value of King Air 200 determined. Held,Further: Amounts withdrawn by Clymer from Denison and repaid were loans, not constructive dividends. Harold D. Rogers, for the petitioners. William P. Hardeman, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: These consolidated cases present four income tax issues concerning a closely-held corporation, Denison Poultry and Egg Co., and its sole shareholder, Ray Clymer, Jr. Respondent determined *477 deficiencies in petitioners' Federal income tax as follows: Petitioner
Taxable Year
Deficiency
Denison Poultry & Egg Co.
1974
$49,044.64
1975
121,920.65
1976
165,266.26
Ray Clymer, Jr.
1974
258,334.09
1975
9,261.89
The issues are: (1) whether payments by the corporation to Clymer are fully deductible as compensation or are, in part, dividends, (2) whether the corporation is entitled to cartain deductions and an investment tax credit with respect to two airplanes used partly for non-corporate purposes by its sole shareholder, (3) whether the salvage value assigned to one of the corporations's airplanes was reasonable, (4) whether certain withdrawals of corporate funds by Clymer and payments by the corporation for Clymer's benefit constitute loans or constructive dividends. GENERAL FINDINGS OF FACT Petitioner Denison Poultry and Egg Co. (Denison) is a Texas corporation having its principal place of business in Wichita Falls, Texas. Denison is engaged in the wholesale distribution of beer, and during the years in issue was the authorized Coors Beer distributor for a thirteen county area in North Texas. Denison timely filed Federal income tax returns for fiscal years ending April 30, 1974, 1975 and *478 1976 at the Austin Service Center, Austin, Texas. Petitioner Ray Clymer, Jr. (Clymer) was during the years in issue, and continues to be, the chief executive officer and sole shareholder of Denison. Clymer timely filed Federal income tax returns for calendar years 1974 and 1975 at the Austin Service Center, Austin, Texas. He resided in Wichita Falls, Texas at the time the petition in this case was filed. Issue 1: Reasonable Compensation
FINDINGS OF FACT Clymer graduated from high school in Dension, Texas, and attended Southern Methodist University. His college education was interrupted by World War II. Upon his return from the war, he began working for Denison, which at that time was not in the Coors Beer distributing business. In 1966 Denison obtained a Coors Beer distributorship for a two county territory in West Texas. Prior to that, Denison had distributed other beers, including Falstaff and Miller. Clymer personally applied for the Coors distributorship. He was selected by Coors from a pool of hundreds of applicants, based on interviews and presentations. The agreement between Denison and Coors provided that, in the event that Clymer died or the distributorship was terminated, *479 Coors would be obligated to purchase all of Denison's assets at fair market value and, in addition, pay Denison an amount equal to one-twelfth of Denison's gross receipts for the previous twelve month period. Although Denison's territory comprised only two counties at the time of the acquisition of the Coors distributorship in 1966, it expanded steadily in subsequent years. By 1974, the territory had grown to thirteen counties in North Texas, extending generally north of the Dallas-Fort Worth area to the Texas-Oklahoma state line. At the time of trial the territory included eighteen counties in Texas and fourteen counties in Arkansas and Tennessee. During the years in issue, Denison had warehouse facilities in Wichita Falls, Denison, and Lake Dallas, at which it received beer by rail or truck and stored it under refrigerated conditions. These warehouse complexes also included offices and facilities for meetings and community services. Denison employed from forty to fifty people during these years. As the president and sole shareholder of Denison, Clymer controlled virtually every aspect of the business. [1] Clymer's responsibilities included formation of company policies and *480 programs; selecting and training personnel; acquiring and maintaining business facilities and equipment; planning growth and expansion; monitoring wages, benefits and working conditions; keeping contact with the retail trade; maintaining the relationship between Denison and Adolph Coors Co.; representing the company in the communities it served; and ensuring the company's compliance with Federal, State and local laws and regulations. Clymer also performed tasks generally delegated to lower-level personnel, such as opening mail and signing checks. He worked from sixty to eighty hours per week, including civic activities. Clymer's substantial involvement in civic affairs enhanced Denison's image in the community. He served as president of the Wichita Falls Board of Commerce and Industry, and *481 as Chairman of the United Fund Campaign, among other activities. In addition, Clymer spent considerable time and effort organizing and supporting alcohol-related elections in various "dry" counties in North Texas. Some of these elections legalized the sale of beer in counties within Denison's territory, contributing to the growth of its sales during the 1970's. In 1970, Clymer entered into a compensation agreement with Denison, which provided that Denison would pay him a salary of $27,000 per year plus an additional 20 percent of the corporation's net profits before income taxes.This agreement was made verbally and was never embodied in a written contract. Essentially, Clymer entered into the agreement with himself; Denison's board of directors, which consisted of Clymer and Winkler, never reviewed his salary. The compensation agreement subsequently was amended to include a Christmas bonus, which was paid to all employees. Denison and Clymer adhered to the agreement from 1970 through the years in issue, 1974-1976. Prior to the 1970 agreement, Clymer's salary had been very modest, and Denison's profits had not been substantial. In its fiscal year ending in 1970 Denison had $38,274 *482 net profit before taxes, and Clymer was paid $22,525. When he entered into the agreement, however, Clymer anticipated that Denison's profits would increase in the years ahead. Denison was extremely successful from 1970 through 1976. During these years, its territory expanded and its sales increased dramatically, from about $2.1 million in 1970 to about 8.8 million in 1976. Its share of the beer market in its territory grew from approximately 12 percent in 1966 to approximately 50 percent in 1976. Denison's gross receipts, net profits and compensation paid to Clymer for taxable years 1970 through 1976 are as follows (years in issue emphasized): DENISON POULTRY AND EGG COMPANY
Net Profit
Fiscal Year
Gross Receipts
Before Income Tax
4-30-70
$2,070,398
$38,274
4-30-71
2,952,657
120,760
4-30-72
4,011,969
232,753
4-30-73
5,068,077
349,938
4-30-74
6,020,810
570,882
4-30-75
7,948,018
925,911
4-30-76
8,880,216
534,924
RAY CLYMER, JR.: COMPENSATION Fiscal
Christmas
Contingent **
Total
Year
Salary
Bonus * *483 Compensation
Compensation
4-30-70
$22,525
$22,525
4-30-71
27,000
500
24,152
51,652
4-30-72
27,000
562
46,551
74,113
4-30-73
27,000
2,250
69,988
99,238
4-30-74
27,000
1,980
102,176
131,156
4-30-75
27,000
15,231
185,182
227,413
4-30-76
27,098
25,203
106,985
159,286
Denison paid no dividends for its taxable years 1974, 1975 and 1976. The decision not to pay dividends in these years was made by Clymer personally, and not by the board of directors. For the years in issue, the five highest paid employees of Denison and their compensation for those years were as follows: Name
1974
1975
1976
Ray Clymer, Jr.
$131,156
$227,413
$159,286
Louis Besancon
30,724
42,669
30,231
Bob Winkler
25,538
25,619
24,242
Jack Mason
23,162
24,756
23,836
Kenneth Reeves
18,894
25,190
22,701
Although all of these employees received a Christmas Bonus, only Clymer received pay under a contingent compensation agreement. On its Federal income tax returns for the years 1974, 1975, 1976, and 1977, Denison deducted the following amounts as compensation paid to Clymer: Year
Amount
1974
$131,156
1975
227,413
1976
159,286
1977
162,448
Clymer reported those portions of his compensation from Denison which were attributable to the percentage of profits agreement on Schedule E of his individual Federal income tax returns for the years 1974 *484 and 1975. These amounts ($102,176 and $185,182, respectively) were not included on Clymer's Forms W-2 for those years, and no income taxes were withheld from these amounts. In a notice of deficiency dated April 6, 1979, respondent determined that the amounts paid to Clymer pursuant to the percentage of profits compensation agreement in the years 1974-1976 were not deductible by Denison because they were not paid to Clymer as compensation. Accordingly, respondent increased Denison's income for those years as follows: Year
Adjustment to Income
1974
$102,176
1975
185,182
1976
106,984
Alternatively, in the notice of deficiency, respondent determined that if the above amounts were paid as compensation certain portions of those amounts exceeded a reasonable allowance for compensation for personal services within the meaning of section 162, [2] as follows: Contingent
Portion Exceeding
Year
Compensation Paid
Reasonable Allowance
1974
$102,176
$55,000
1975
185,182
150,000
1976
106,984
75,000
We find as a fact that the amounts paid to Clymer in each of the years here involved under the percentage of profits compensation agreement were *485 paid to him as compensation. OPINION Section 162(a)(1) allows a deduction for ordinary and necessary business expenses, including "a reasonable allowance for salaries or other compensation for personal services actually rendered." Petitioner Denison Poultry & Egg Co. paid Ray Clymer, Jr. total compensation of $131,156 in 1974, $227,413 in 1975, and $159,286 in 1976. Respondent determined [3] *486 that this exceeded a "reasonable allowance" to the extent of $55,000, $150,000, and $75,000, respectively. Accordingly, respondent would allow a deduction for compensation in the amounts of $76,156 for 1974, $77,413 for 1975, and $84,286 for 1976. Respondent relies heavily on Clymer's status as sole shareholder, and the absence of dividend payments, in support of his contention that the payments in part represent a distribution of corporate earnings to Clymer. Petitioner argues that the payments constitute reasonable compensation paid pursuant to the contingent compensation agreement in force since 1970. Section 162(a)(1) establishes a two-part test for the deductibility of compensation: (1) the amount of the compensation must be reasonable, and (2) the payments must in fact be purely for services. Section 1.162-7(a), Income Tax Regs. Because the existence of a compensatory purpose is normally inferred if the amount of the compensation is reasonable, the primary inquiry in most cases is whether the amount of the purported compensation is reasonable. Elliots, Inc. v. Commissioner,716 F.2d 1241 (9th Cir. 1983), revg. and remanding a Memorandum Opinion of this Court. This is a question to be resolved on the basis *487 of all the facts and circumstances of the case, Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564, 567 (1974), affd. 528 F.2d 176 (10th Cir. 1975), and the burden of proving the reasonableness of the compensation is upon the petitioner. Botany Worsted Mills v. United States,278 U.S. 282 (1929). A list of factors generally considered by courts in evaluating the reasonableness of compensation is found in Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court. [4]
Where compensation is the form of a percentage of the net profits of the business is paid to the sole shareholder of a closely-held corporation, but not to any of the other employees, careful scrutiny is required in order to ensure that a portion of the purported compensation is not a disguised dividend. Elliot's, Inc. v. Commissioner,supra; *488 Charles Schneider & Co. v. Commissioner,500 F.2d 148, 151 (8th Cir. 1974), affg. a Memorandum Opinion of this Court; Logan Lumber Co. v. Commissioner,365 F.2d 846, 851 (5th Cir. 1966), affg. on this issue a Memorandum Opinion of this Court; section 1.162-7(b)(1), Income Tax Regs. This is particularly true where, as here, the employee is the sole shareholder and the corporation has paid no dividends. In this situation, it is likely to be in the interests of both the corporation and the shareholder-employee to characterize payments as compensation rather than dividends. See Elliot's, Inc., v. Commissioner,supra.[5] *489 However, we have concluded in this case that the entire amounts paid to Clymer were intended to be compensation. Petitioner relies heavily on the compensation agreement according to which Clymer received a salary of $27,000 plus a bonus and an additional 20 percent of Denison's net profits before taxes to prove that Clymer's compensation was reasonable. It is contended that the compensation agreement was entered into on fair and mutually advantageous terms at a time when Denison's profits were not substantial, that the agreement was adhered to consistently from 1970 through 1976, and that the essence of such a contingent compensation agreement is that the fortunes of the employee rise or fall with the success of the enterprise with the result that compensation in profitable years is expected to be greater than compensation that is fixed and definite. See Commercial Iron Works v. Commissioner,166 F.2d 221 (5th Cir. 1948), *490 affg. a Memorandum Opinion of this Court; Mayson Mfg. Co. v. Commissioner,supra.
Our starting point for evaluating the reasonableness of this compensation arrangement is section 1.162-7(b)(2), Income Tax Regs. , which provides in part: While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. (emphasis added). Petitioner urges that the regulation sanctions this compensation arrangement, but it is clear that the regulation is premised upon a "free bargain" between the employer and employee. *491 We are unable to find such an arm's length agreement on the facts of this case. Clymer essentially entered into an unwritten compensation agreement with himself; he set his own salary, which was never reviewed, even by Denison's token board of directors. Under these circumstances, it is a fiction to characterize this agreement as a means of "securing on fair and advantageous terms the services of the individual." Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,supra;Charles Schneider & Co., Inc. v. Commissioner,supra at 152-153; Royal Crown Bottling Co. of Winchester, Inc. v. Commissioner,T.C. Memo 1983-611. Compare Mayson Mfg. Co. v. Commissioner,supra and Kennedy v. Commissioner,671 F.2d 167 (6th Cir. 1982), revg. 72 T.C. 793 (1979) (bonus compensation agreements entered into at arm's length between majority shareholder and employee). Petitioner also argues that such contingent compensation arrangements are reasonable because they provide an incentive for performance and tend to stimulate business. We doubt that the sole shareholder of a corporation needs any additional incentive to give his best efforts. Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, *492 supra at 182. As Judge Murdock once stated: "For the sole owner to pay himself a bonus as an incentive to do his best in managing his own business is nonsense." University Chevrolet Co. v. Commissioner,16 T.C. 1452, 1455 (1951), affd. 199 F.2d 629 (5th Cir. 1952). By concluding that the contingent compensation agreement should not be given too much weight in evaluating the reasonableness of Clymer's compensation, we do not mean to suggest that this in itself establishes that the compensation is unreasonably high. This must still be determined on the basis of all the facts and circumstances, with the awareness that Clymer's dual role of sole shareholder and employee warrants close scrutiny. See Laure v. Commissioner,70 T.C. 1087, 1100-1101 (1978), affd. and revd. on other issues, 653 F.2d 253 (6th Cir. 1981); Elliot's, Inc. v. Commissioner,supra.
Some of the most important factors to consider are the employee's qualifications and skill, the scope of his responsibilities, and his role in the success of the enterprise. There is no doubt that Denison was a "one-man operation" and that Clymer was largely responsible for the company's success during these years. The very fact that *493 he was awarded the Coors distributorship indicates that he was a successful and highly regarded businessman. Clymer worked long hours and controlled virtually every aspect of Denison; his penchant for detail in running the company was such that he opened the mail and signed most of the checks. No other employee has significant managerial responsibilities for the overall business. Denison's growth and the expansion of its distribution territory throughout the 1970's must be attributed in large part to Clymer's efforts. He maintained a strong relationship with Coors, often attending meetings at the company's head-quarters in Colorado, and his value as a distributor was reflected by the expansion of Denison's territory. Starting with two counties in 1966, it grew to thirteen during the years in issue.Denison's market share increased from 12 percent to approximately 50 percent by 1976. In addition, Clymer's substantial involvement in civic activities and his influence in the community appears to have helped quell some of the resistence to the sale of beer in certain counties; his efforts in supporting elections which legalized the sale of beer in some dry counties, while perhaps somewhat *494 overstated by petitioners, should not be discounted entirely. Clymer's role in Denison's success may be partially eclipsed by the popularity of Coors' beer during these years, which was due in large part to the promotion and advertising of the product by Adolph Coors, Co. and to the preferences of the consuming public.[6] It is certainly more profitable to distribute a popular beer which enjoys a large market share than one which doesn't. Compare Royal Crown Bottling Co. of Winchester, Inc.,supra. However, there was testimony that indicated that not all Coors distributors fared as well as Denison and that some in fact failed. [7] *495 Respondent points to the disparity in compensation between Clymer and the next highest paid employees as evidence that part of the payments to Clymer represented a distribution of earnings. During these years, Clymer earned between four and five times as much as Denison's next highest paid employee. While the disparity is substantial, we have observed that Clymer's responsibilities far exceeded those of any other employee, and we therefore do not give much weight to this fact. Laure v. Commissioner,supra.
Perhaps the most important factor, given the lack of arm's length bargaining and the absence of dividends during these years, is the comparison of Clymer's compensation to that paid to similar employees by comparable employers. Laure v. Commissioner,supra. The regulations provide: "It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like *496 circumstances." Section 1.162-7(b)(3), Income Tax Regs. On this point, both parties presented evidence which, although helpful, is not dispositive of the issue, as we explain. Petitioner presented the testimony of Dick Azar, who was the president and owner of Dickshire, Inc., the Coors distributor for El PasoTexas. Dickshire was larger than Denison. During the years 1974-1976, Dickshire's sales territory comprised three counties in West Texas, and its sales ranged from about $11 million to $14 million. It employed about 60 people. Dickshire paid Azar a salary of approximately $30,000, plus 25 percent of net profits before taxes. His total compensation for the years 1974-1976 was $260,000, $310,000, and $360,000, respectively. Petitioner arguestant because Dickshire and Denison are comparable companies, the compensation paid to Azar eatablishes the reasonableness of Clymer's compensation. We do not think it possible to draw such a conclusion on the basis of only one company. The compensation arrangement between Dickshire and Azar was no more at arm's length than the one in question.[8] Without more information about the salary structures of other beer distributorships, we are *497 unable to determine whether Dickshire provides a fair comparison. Respondent relies heavily on his expert witness, Frank Manley, who heads a management consulting firm which specializes in executive compensation, and who has a wide range of experience developing compensation plans for small and medium sized companies. Manley's study compared Clymer's compensation to the compensation paid to chief executive officers of other companies of comparable size, based on annual revenues. The report establishes a rate of "competitive compensation" for each year -- the rate of compensation, based on the comparative study, which would have to be paid to attract someone to the position of chief executive officer of a company the size of Denison. Manley's study used various sources of data, but relied most heavily on American Management Associations -- Top Management Reports and Statistical Supplements for the years 1974-1977 (hereinafter AMA report), which is a comprehensive report on executive compensation that is widely used in compensation administration. Of the companies listed in that source, the study focused *498 on those in the non-durable goods manufacturing industry. No survey information was available regarding companies that are directly competitive with Denison, because they are privately owned. [9] In addition to the AMA report, Manley examined six soft drink companies, and also referred to other compensation reports. Manley considered only "direct" cash compensation, such as salary and bonuses, and did not consider "indirect" compensation such as pension and profit-sharing plans, group insurance, and other deferred income. For the years 1974-1976, the competitive compensation for the chief executive of a company comparable in size to Denison was found to be as follows: Competitive Range
Competitive
Year
Rate
Minimum
Maximum
1974
$69,700
$52,300
$87,000
1975
79,900
59,900
99,900
1976
84,700
63,500
105,900
We are impressed with the thoroughness of Manley's report, and we found his testimony generally to be credible and *499 persuasive. However, we are unable to accept his determination of the competitive rate as dispositive of the reasonableness of Clymer's compensation. While we agree that Manley's approach is fundamentally sound, given the need to determine the amount of compensation that would be paid in an arm's length situation, his analysis has some shortcomings. [10]Manley considered only direct cash compensation, and ignored indirect compensation such as pension and profit-sharing plans. As Manley himself admitted, many of the businesses used in his comparative study were likely to have provided substantial indirect compensation to their chief executives; it is likely that his figures understate the competitive rate for Clymer's position, given the fact that Denison had no significant pension or profit-sharing plan. [11] In addition, we are hesitant to base the determination of the reasonableness of Clymer's compensation entirely on industry averages or medians where it is not clear that the companies in the surveys are directly comparable to Denison. Given Clymer's broad responsibilities, the hours he devoted to the business, his control over and management of virtually every aspect of the *500 company, and his somewhat unique abilities in promoting his business and securing additional territory, we think that industry averages may not accurately reflect his value to Denison. As we stated in a prior case: "Section 162(a)(1) was not designed to regulate businesses by denying them a deduction for the payment of compensation in excess of the norm." Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142, 1162 (1980). See also Demian, Ltd. v. Commissioner,T.C. Memo 1983-683; Georgia Crown Distributing Co. v. Commissioner,T.C. Memo 1983-459; Royal Crown Bottling Co. of Winchester, Inc.,supra.[12] *501 To determine what is "reasonable" compensation in any situation is a difficult task, given the various factors to consider, the unique aspects of every business, and the unavoidable tension between the rules of section 162 and the latitude allowed to business judgment. As our discussion indicates, there are factors which support both sides in this case. On the basis of the record as a whole, we think petitioners have demonstrated that a reasonable compensation for Clymer's services to Denison exceeds the amounts allowed by the respondent.In such a case, we are left with the task of determining from the entire record what was reasonable compensation on these particular facts and circumstances. Pepsi-Cola Bottling Co. of Salinas, Inc. v. Commissioner,supra, at 568. Although we think that Clymer's exceptional abilities, broad responsibilities, and success in expanding the business justify a commensurate level of compensation, we are unable, for the reasons expressed above, to accept the contingent compensation agreement as a conclusive means of determining reasonable compensation. While such arrangements may be reasonable in *502 a true arm's length situation, the arrangement here simply does not withstand the close scrutiny required where a sole shareholder sets his own salary. Here, the compensation agreement could have been changed at any time by Clymer without the concurrence of anyone else. Despite our inability to recognize the contingent compensation agreement as determinative of the question of reasonableness, we would still be compelled to approve the amounts of compensation in question if we were to find them justified by all the facts and circumstances. See Elliot's, Inc. v. Commissioner,supra.However, we are troubled by the huge increase in Clymer's earnings attributable solely to the increasing profitability of the company, without any evidence that his responsibilities or performance justified such substantial increments. We are unable to escape the conclusion that some portion of the payments Clymer received during these years have as much of an entreprenurial quality as they do a compensatory quality. See Pacific Grains, Inc. v. Commissioner,399 F.2d 603, 606 (9th Cir. 1968), affg. a Memorandum Opinion of this Court. [13] *503 Furthermore, while the evidence offered by both parties on the question of comparative compensation must be discounted to some extent, we think respondent's evidence was more persuasive. We find Manley's testimony and report to be persuasive evidence that Clymer's compensation was unreasonably high in relation to the size and complexity of the business. [14] But, as we have indicated, some adjustment of his figures is necessary in light of the limitations of his study and Clymer's broad responsibilities. Using our best judgment, based on all the evidence in the record, we find a reasonable compensation for Clymer's *504 services, including salary, Christmas bonus, and contingent compensation, to be $115,000 in 1974, $130,000 in 1975, and $135,000 in 1976. 2. Airplane Expenses and Investment Tax Credit
FINDINGS OF FACT Denison purchased a Beechcraft Queen Air (Queen Air) airplane in February 1973. The Queen Air was owned for nine months of Denison's taxable year 1975. [15]
The Queen Air was purchased primarily for use in Denisons's business, and was used primarily for such purposes. The Queen Air was flown a total of 296.4 hours during the 1975 taxable year. Approximately 251.4 of the hours flown, (84.82 percent) were attributable to corporate business use. The remaining 45 hours (15.18 percent) were attributable to Clymer's personal use of the plane for nonbusiness purposes. Clymer paid rental fees of $65 per hour to Denison for his use of the Queen Air.This was the fair rental value for hourly use of a Queen Air. In January 1975 Denison traded in the Queen Air and purchased a new Beechcraft King Air 200 airplane (King Air). The King Air was purchased primarily for use in Denison's business, and was used primarily for *505 such purposes.
The King Air was owned for a three month period during the taxable year 1975. During that period, it was flown a total of 79.9 hours. Of those hours, 58.6, (73.34 percent) were attributable to corporate business use, and 21.3, (26.66 percent) were attributable to Clymer's personal use of the plane for nonbusiness purposes. The King Air was owned for nine months during the taxable year 1976. During that time, it was flown a total of 300.8 hours. Of those hours, 204.5, (68 percent) were attributable to corporate business use, and 96.3 (32 percent) were attributable to Clymer's personal use of the plane for nonbusiness purposes. For his use of the King Air during the three months of the taxable year 1975, Clymer paid Denison a rental fee of $150 per flying hour. For 75.2 of the 96.3 hours (25 percent of the total hours for 1976) that he used the King Air for personal purposes during the taxable year 1976, Clymer paid Denison a rental fee of $275 per hour. Clymer paid no rental fee for the remaining 21.1 hours (7 percent of the total hours for 1976) that he used the plane during that period. The fair rental value for hourly use of a Beechcraft King Air during this *506 period was $275 per flying hour. Clymer entered into no written agreement with Denison concerning his personal use of the airplanes. He testified that he entered into a "verbal" rental contract with the company. Denison never advertised the airplanes for rent. Clymer testified that another employee of Denison once rented one of the airplanes, but no one else used the planes. Clymer at times used the airplanes for personal trips that extended overnight. On such occasions, Clymer paid for only the actual flying time, even if the airplane remained at the destination for an extended period of time. Clymer paid nothing for the standby time on such trips. Clymer determined the amount of the rental fees he paid Denison for the use of the airplanes by talking to people at Beechcraft as well as other people who chartered airplanes. Beechcraft airplanes such as the Queen Air and King Air generally increased in price throughout these years, partly because of inflation. For the use of the Queen Air (nine months) and the King Air (three months) during the taxable year 1975, Clymer paid Denison a total of $7,048. On its Federal income tax returns for that year, Denison claimed the following *507 operating expenses and depreciation in connection with the Queen Air and the King Air: Operating Expenses
General
$17,410
Pilot's Salary
13,713
Pilot's Travel Expenses
7,715
Insurance
3,476
total
$42,314
Depreciation
$89,906
In his notice of deficiency for taxable year 1975, respondent disallowed the operating expenses and depreciation claimed by Denison which were attributable to Clymer's personal use of the airplanes. Accordingly, 15.18 percent of the deductions attributable to the Queen Air, and 26.66 percent of the deductions attributable to the King Air, were disallowed as follows: Operating Expenses
Amount Claimed
$42,314
Amount Disallowed
7,832
Depreciation
Amount Claimed
$89,906
Amount Disallowed
22,621
For the use of the King Air during the taxable year 1976, Clymer paid Denison a total of $20,680. On its Federal income tax returns for that year, Denison claimed the following operating expenses and depreciation in connection with the King Air: Operating Expenses
General
$17,454
Pilot's Salary
16,649
Pilot's Travel Expenses
8,617
Insurance
7,473
Total
$50,193
Depreciation
$281,401 In his notice of deficiency for taxable year 1976, respondent disallowed the operating expenses and depreciation claimed by Denison *508 which were attributable to Clymer's personal use of the airplane. Accordingly, 35.29 percent [16] of the deductions were disallowed as follows: Operating Expenses
Amount Claimed
$50,193
Amount Disallowed
17,713
Depreciation
Amount Claimed
$281,401
[17] Amount Disallowed 191,776
Clymer's payments to Denison, and the corporate deductions attributable to Clymer's personal use of the airplanes, are summarized as follows: Deductions Attributable
to Clymer's Personal Use
Operating
Rental Fees
Year
Expenses
Depreciation
Total
Paid to Denison
1975
$7,832
$22,621
$30,453
$7,048
1976
17,713
[18] *509 44,321
62,034
20,680
Denison reported as rental income for tax purposes all monies received from Clymer for the rental of the Queen Air and King Air. Clymer did not deduct any part of the aircraft rent paid to Denison. On its Federal income tax return for taxable year 1975, Denison claimed an investment tax credit for the purchase of the King Air. Denison computed the credit using 100 percent of its cost basis in the plane, $781,669. In his notice of deficiency, respondent determined that Denison was not allowed an investment credit for the proportional amount of the airplane's basis allocable to Clymer's personal use of the plane. Accordingly, respondent recomputed the credit by reducing the basis of the airplane by 26.66 percent. In addition, respondent determined that Denison must recaputure in 1976 a portion of the investment credit allowed on the King Air as a result of the decline in the proportion of business usage from 73.34 percent in taxable year 1975 to 64.71 percent in taxable *510 year 1976. OPINION During its taxable years 1975 and 1976, Denison owned a Beechcraft Queen Air airplane (Queen Air) and, Later, a Beechcraft King Air airplane (King Air) which were used primarily for business purposes of the corporation. However, the airplanes were also used by Clymer, Denison's president and sole shareholder, for personal trips. With the exception of a small number of hours in 1976, Clymer paid Denison rental fees, on a per-flying hour basis, for his personal use of the airplanes, at rates which represented the fair rental value for the hourly use of the airplanes. Denison reported these payments as rental income. The issue is whether Denison is entitled to claim the full operating expenses, depreciation, and investment tax credit associated with the use of the airplanes, or whether such deductions and credit must be reduced by the proportional amounts allocable to Clymer's personal use of the airplanes. It is not disputed that the airplanes were purchased and used by Denison primarily for business purposes. Denison's distribution territory covered a wide geographic area, and Clymer frequently made business trops to the three warehouse facilities and to various *511 other towns. In addition, he flew to Colorado quite often for meetings at the Coors brewery. the planes were used for business purposes for a substantial proportion of the total flying hours. The Queen Air was used approximately 85 percent for business purposes in 1975, and the King Air was used for such purposes approximately 73 percent in 19752 and 68 percent in 1976. The dispute concerns the characterization of Clymer's use of the planes for personal purposes unrelated to Denison's business. With the exception of a small number of hours in 1976 (7 percent of the total flying hours), [19] Clymer paid rental fees to Denison which are conceded by respondent to represent a fair rental value for the hourly use of the planes. [20] Respondent relies primarily on a line of authority which *512 supports an allocation of deductions between business and nonbusiness use where property is held partly for the personal benefit of shareholders. Petitioner argues that the rental of the airplanes to Clymer constitutes a separate trade of business so that the related deductions are allowable under sections 162 and 167 or, alternatively, as expenses related to the production of income under section 212. [21]
There is no evidence to support petitioners' arguments that Denison was in the separate business of renting airplanes or used the airplanes for the production of income. The *513 planes were rented only to Clymer and, while Clymer paid rent, there is nothing to indicate that Denison expected to make a profit from this activity. Clymer's use of the planes was simply an accommodation to him by the corporation.We address these arguments more fully later. We still have the question, however, of whether the expenses of owning and operating the planes must be allocated between business use and nonbusiness use by Denison.
Where corporate property is used both for business purposes and for the personal benefit of a shareholder, and both such uses are substantial, the deductions associated with the use of the property must be allocated between the business and nonbusiness use. International Artists, Ltd. v. Commissioner,55 T.C. 94, 105 (1970). In International Artists, the president and controlling shareholder of the corporation used a house owned by the corporation as a residence for part of the years in question. The corporation was in the business of creating musical programs performed by the shareholder, who was a prominent entertainer, and the house was specially equipped for such purposes.The shareholder paid rent for his use of a portion of the house as *514 a residence. The Court allowed 50 percent of the deductions, based on its allocation of half the deductions to business use and half to personal use. Although petitioner argued that the rental payments fully compensated the corporation for the shareholder's use of the property, the Court noted that the shareholder's use of the house was not limited to the portion of the premises described in the lease, and that "[t]he entire home remained at all times accessible to petitioner… Petitioner, in fact, regarded the entire home as his own." 55 T.C. at 106. See also Sapp v. Commissioner,36 T.C. 852 (1961), affd. per curiam 309 F.2d 143 (5th Cir. 1962); Egan v. Commissioner,T.C. Memo 1982 - 237; Proctor v. Commissioner,T.C. Memo 1981-436 (Deductions for operating expenses disallowed to corporations proportionately to shareholders' personal use of automobiles). Petitioner attempts to distinguish these cases on the basis that the shareholders did not pay fair rental value for the use of the property, whereas it is conceded in this case that Clymer paid Denison rental fees that represent the fair rental value for the hourly use of the airplanes. [22] We have carefully considered the relevant *515 cases in this area, and conclude that this distinction is without consequence to the issue before us. In such cases of dual use of corporate property, there are usually two ramifications: (1) the disallowance to the corporation of deductions, to the extent of the nonbusiness use of the property, and (2) the receipt by the shareholder of a constructive dividend to the extent of the fair rental value of the use of the property. See, e.g., International Artists v. Commissioner,supra. These are independent inquiries. While the payment by the shareholder of a rental fee may reduce [23] or, as in this case, eliminate the constructive dividend, it does not follow that such payment also entitles the corporation to a larger deduction. [24] *516 In International Trading Co. v. Commissioner,275 F.2d 578 (7th Cir. 1960), affg. a Memorandum Opinion of this Court, the corporation, which was in the brewery supply business, purchased residential lakefront property for $24,000 and made substantial improvements at a cost of $344,000. The majority shareholder and his family used the property during the summers, and paid rent totalling $8,400 per year. The Tax Court found this to be the fair rental value of the property. The corporation claimed operating expenses and depreciation in connection with the property, which totalled between $34,000 and $38,000 each year. The Seventh Circuit affirmed the Tax Court's finding that the deductions were not allowable because the property was maintained primarily for the personal benefit of the stockholders. On appeal, the petitioner in International Trading raised the additional argument that the deductions should be allowed because it was engaged in the business of holding real estate and collecting rents, which were equal to fair rental value. In rejecting *517 this argument, the Court observed that there was no evidence that indicated the property was maintained to be rented at a profit, noting particularly that the corporation never attempted to rent the property to others outside of the shareholder's family, and never advertised the property for rent. The Court also emphasized that the corporation expended a substantial sum of money in purchasing and improving the property, and that each year it expended substantially more on the property than the rent it received. The Court held that the expenses were not an ordinary and necessary business expense of the corporation, and also held that the depreciation deductions were not allowable, on the same reasoning. We have followed International Trading on at least two occasions in denying deductions to corporations where shareholders paid fair rental value for the use of property held by the corporation. In Forster Mfg. Co. v Commissioner,T.C. Memo 1972-138, the president and majority shareholder of the corporation and another employee paid fair rental value for the use of houses owned by the corporation. The expenses claimed exceeded the rental income received. We stated: "The payment of *518 the fair rental value by the tenants does not convert the properties' character from personal to business use… At best its only result is to prevent constructive dividend treatment to such tenants." See also Hofmann Bros. Realty Corp. v. Commissioner,T.C. Memo 1963-320 (fishing boat rented to company controlled by majority shareholders at fair rental value). We find these cases to be dispositive of the issue here. The fact that Clymer paid a fair rental value for the hours he used the airplanes is insufficient to elevate the activity to the status of a trade or business of Denison. While the rental fees paid during these years totalled $7,048 and $20,680, the corresponding deductions totalled $30,453 and $62,034. Denison never advertised the airplanes for rent, and there is no evidence that anyone but Clymer rented them. Petitioner maintains that Clymer only "rented" the planes when they were not needed for corporate business; obviously, as Clymer conducted virtually all the important business of the corporation, Denison was not likely to need the airplanes while Clymer was away on a personal trip. The record indicates that Clymer had unrestricted access to the airplanes; *519 as respondent observes, while the airplanes were sitting in the hangar, they were just as ready to be rolled out for personal use as for business use. Finally, we think it is significant that Clymer paid nothing for the standby time on those occasions when his trips extended over several days. See Hofmann Bros. Realty Corp. v. Commissioner,supra.As in other areas of the tax law, in determining whether an activity constitutes a trade or business, we must look beyond the form to the substance of the transaction. International Trading Co. v. Commissioner,supra.We cannot imagine that a "rental agreement" such as the one in question would ever arise in an arm's length situation. The substance of this transaction is that Denison deducted the expenses related to Clymer's personal use of the airplanes, which is beyond the scope of sections 162(a) and 167(a). Petitioner argues alternatively that the deductions are allowable under sections 212 and 167(a)(2), because the airplanes were held for the production of income. We reject this argument for the same reasons discussed above. We also note that section 212 applies only to individuals. We hold for respondent that Denison is not *520 allowed to deduct the expenses or claim the portion of the investment credit which are allocable to Clymer's personal trips. Because of respondent's concession regarding the percentage of business use in 1976, and the confusion regarding the amount of depreciation allocable to personal use, a computation pursuant to Rule 155 will be necessary. [25] *521 Issue 3: Salvage Value of Airplane
FINDINGS OF FACT Denison purchased a Beechcraft King Air 200 airplane in January, *522 1975. The airplane was purchased primarily for use in Denison's business. The King Air 200 was a new model introduced in 1975, which had different engines and a different tail design than previous King Air models. The cost of the airplane to Denison was $781,669. During the late 1960's and early to mid 1970's, the list prices for new Beechcraft airplanes such as the King Air generally increased, partly because of inflation. For depreciation purposes, Denison assigned to the airplane a useful life of five years and depreciated the airplane using the double declining balance method. On its Federal income tax returns for taxable years 1975 and 1976, Denison claimed depreciation on the airplane in the amounts of $78,167 and $281,401, respectively. In his notice of deficiency, respondent determined that a reasonable salvage value of the King Air 200 using a five year useful life was $565,000. This is approximately 72 percent of the airplane's cost. Accordingly, respondent disallowed $142,899 of the depreciation claimed on the airplane for taxable year 1976. [26] *523 OPINION Denison depreciated its Beechcraft King Air 200 airplane using a double declining balance method, and assigned to the airplane a five year useful life. This reduced the basis of the plane to $422,101 by the end of 1976. Respondent determined the salvage value of the airplane to be $565,000, or approximately 72 percent of cost. Petitioner argues strenuously that respondent's method of determining the salvage value of the airplane is flawed; specifically, petitioner contends that respondent assumed that prices of airplanes would increase from 1975 to 1980, and that such an assumption is impermissible according to the regulations and case law. Petitioner contends that the proper salvage value of the airplane is 30 percent of cost. We think that petitioner misinterprets the law governing salvage value, and we sustain respondent's determination in part. Before we discuss the merits of the salvage value issue, we must dispose of two preliminary issues. Respondent moved at trial to exclude evidence on the salvage value issue, on the grounds that petitioner should be collaterally estopped from relitigating the issue before this Court. We denied the motion *524 at trial. Because respondent has raised this question again on brief, we will explain our decision. This same issue of the salvage value of the King Air airplane was litigated in the District Court in Texas. [27] In a memorandum opinion issued in July, 1982, that court found a reasonable salvage value to be 70 percent of cost. Denison Poultry & Egg Co. v. United States,52 AFTR 2d 83-5148 (N.D. Tex. 1982). However, apparently because of petitioner's persistence in filing motions for reconsideration, a final judgment in that case has not been entered. We sympathize with respondent's position, and regret that valuable time has been spent relitigating this issue.However, we think that a prerequisite to the application of collateral estoppel is a final judgment in the prior proceeding. Commissioner v. Sunnen,333 U.S. 591 (1948); Ashe v. Swenson,397 U.S. 436 (1970); Arizona v. California,460 U.S.    , 103 S.Ct. 1382 (Mar. 30, 1983). Thus, while this result does violence to the underlying principle of the doctrine of collateral *525 estoppel, that an issue once fully and fairly litigated should not be relitigated by the same parties, we reluctantly conclude that the absence of a final judgment in the District Court proceeding necessitates our consideration of the merits of this issue. We also must consider petitioner's argument that respondent's determination of the salvage value of the airplane is not entitled to the customary presumption of correctness, Welch v. Helvering,290 U.S. 111 (1933), because it was based on an assumption of airplane price increases subsequent to the time the airplane was placed in service. Petitioner contends that the use of such an assumption is contrary to the regulations and case law, so that respondent's determination is "arbitrary and invalid." Despite petitioner's repeated efforts to put words in the mouth of an expert witness, the record reveals no such "erroneous assumption"; as our discussion below indicates, we find respondent's method of determining salvage value to be sound.
It is fundamental to the concept of depreciation that a taxpayer may not depreciate an asset below a reasonable salvage value. Hertz Corp. v. United States,364 U.S. 122, 128 (1960); section 1.167(a)-1(a), Income Tax Regs. *526 Denison depreciated the Beechcraft King Air using the double declining balance method, which allows a rapid rate of depreciation in the early years of an asset's life. In the first two years, Denison claimed depreciation totalling $359,568, which reduced the airplane's basis to $422,101. [28] This is substantially less than the $565,000 salvage value determined by respondent. It is not evident what salvage value, if any, petitioner assigned to the airplane at the time it was acquired. Given the absence of evidence and petitioner's silence on this point, we are inclined to agree with respondent that Denison never determined any salvage value, reasonable or otherwise. [29] *528 Petitioner now disputes the salvage value determined by respondent, and urges us, somewhat after the fact, to find a salvage value of 30 percent of cost. If this were a case where respondent had redetermined salvage value on account of petitioner's miscalculation, we might allow some latitude to the taxpayer's determination which, because it is required to be made at the time the asset is acquired, is necessarily only an estimate. Section 1.167(a)-1(c)(1), Income Tax Regs.; *527 Massey Motors v. United States,364 U.S. 92, 104-105 (1960). As we have recognized: "The essential concept underlying the depreciation allowance * * * is prediction or estimation." Macabe Co. v. Commissioner,42 T.C. 1105, 1112 (1964). Here, however, we are unable to discern any prediction or estimate by the taxpayer, and review only the respondent's determination, which is presumptively correct. Welch v. Helvering,supra.Deductions, such as the allowance for depreciation, are a matter of legislative grace, New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934), and petitioner bears the burden of demonstrating that respondent's determination is invalid. Welch v. Helvering,supra.
Salvage value is defined by the regulations to be "the amount (determined at the time of acquisition) which is estimated will be realizable upon sale or other disposition of an asset when it is * * * to be retired from service by the taxpayer." Section 1.167(a)-1(c)(1), Income Tax Regs. As accurate determination of salvage value is crucial to the calculation of depreciation, because the purpose of the depreciation deduction is to allow the taxpayer to recover only his net investment in an asset. As the concept has been articulated by the Supreme Court: The end and purpose of it all is to approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets. For this purpose it is sound accounting practice annually to accrue as to each classification of depreciable property an amount which at the time it is retired will with its salvage value replace the original investment therein. [Detroit Edison Co. v. Commissioner,319 U.S. 98, 101 (1943)] [emphasis supplied].
Salvage value is the equivalent of the resale value of the asset. Massey Motors v. United States, supra at 107. *529 In this respect, the term "salvage value" is something of a misnomer, for if the actual productive life of the asset is longer than its useful life in the taxpayer's trade or business, the salvage value may be a high percentage of original cost. The regulations emphasize this point: The time at which an asset is retired from service may vary according to the policy of the taxpayer. If the taxpayer's policy is to dispose of assets which are still in good operating condition, the salvage value may represent a relatively large proportion of the original basis of the asset. [Section 1.167(a)-1(c)(1), Income Tax Regs.] [30]
Denison assigned a five year useful life to the airplane, but it is clear from the record that such planes have a much longer productive life, and generally retain a high percentage of their value after five years. [31] *530 In accordance with the principle that salvage value is the equivalent of resale value, respondent determined the salvage value of the airplane by using the market value approach. Respondent's valuation expert, W. A. Andres, analyzed the historical market values, after five years, of similar Beechcraft airplanes. [32] The study covered various models purchased during the years 1968-1972. Andres found that, after five years, the average wholesale and retail prices of these planes represented 68 percent and 76 percent, respectively, of the original list price. Applying these percentages to the $781,669 cost of Denison's King Air, Andres determined that the salvage value would range from $535,105 (wholesale) to $598,058 (retail). Accordingly, respondent arrived at $565,000 as a reasonable salvage value for the airplane. Before considering petitioner's objection to respondent's method of determining salvage *531 value, we think it is important to emphasize that the determination was based on the actual historic market values of similar airplanes. This method of examining the percentage of list price realizable after five years of use strikes us as the most appropriate measure of salvage value. While such historic data cannot guarantee absolute certainty, "prediction is the very essence of depreciation accounting." Massey Motors v. United States,supra at 105. Petitioner argues that respondent's market value approach to salvage value is flawed because it assumes continuing price increases in the future, which petitioner asserts is contrary to the regulations and case law. We disagree. Petitioner argues that, because the list prices of airplanes increased throughout the years involved in Andres' study, Andres necessarily based his determination of salvage value on the assumption that price increases would occur during the years 1975-1980. It is clear from his report and testimony that Andres made no such assumption. He simply calculated historic market values of the airplanes and applied the relevant percentages to Denison's cost basis of the airplane. Despite the clear, self-explanatory *532 nature of the report, and Andres' equally unambiguous testimony, petitioner's counsel repeatedly attempted to put words into the witness' mouth and procure an admission that he made an assumption regarding price increases. We expressed our impatience with these tactics at trial, and regret the inordinate amount of time they consumed. It is evident from the record that the prices of new airplanes generally increased during the late 1960's and early to mid 1970's, largely because of inflation. To the extent that such price increases influenced the resale value of the airplanes, they are entirely appropriate to any estimation of salvage value. Petitioner argues that price increases can have no bearing on salvage value; in this respect we think it misinterprets the law. Petitioner relies heavily on the following passage in the regulations: "Salvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels." Section 1.167(a)-1(c)(1), Income Tax Regs. This provision has no relevance to this case. The issue here is the reasonableness of the initial determination of salvage value. The provision quoted above *533 applies only to a redetermination of salvage value at a later time, and provides that changes in price levels alone do not justify an adjustment of salvage value. Here, there has been no such adjustment on account of price increases. If price increases in the past indirectly entered into respondent's estimation of salvage value, that is consistent with the market value approach, as we have explained. Not only was it reasonable to predict future market values on past experience, but petitioner also concedes that when Denison purchased the airplane, it was expected to appreciate in value. Under these circumstances, it would be unreasonable not to consider such projected appreciation in determining salvage value. See Dickson v. Commissioner,T.C. Memo 1983-723. Petitioner's reliance on Fribourg Navigation Co. v. Commissioner,383 U.S. 272 (1966), as support for the proposition that the market value approach to salvage value is invalid, is equally misplaced. Fribourg resolved the uncertainty surrounding a quite different question: the effect of an unanticipated sale of an asset, prior to the end of its useful life, at a price exceeding its adjusted basis. In Fribourg, unforeseen *534 circumstances (the Suez crisis) created an acute shortage of cargo ships, and the taxpayer was able to sell his ship at a substantial gain. The Commissioner disallowed the depreciation deduction for the year of the sale, on the reasoning that the tremendous appreciation in value of the ship was inconsistent with any allowance for depreciation. In holding that the depreciation was allowable, the Supreme Court noted that depreciation of assets and the gain on the sale of assets are independent concepts, and that such an unanticipated increase in value should have no impact on depreciation, provided that the original determination was reasonable. The Court stated: "This carefully constructed regulatory scheme provides no basis for disallowances of depreciation when no challenge has been made to the reasonableness or accuracy of the original estimates of useful life or salvage value." Fribourg Navigation Co. v. Commissioner,supra at 278. See also Macabe Co. v. Commissioner,42 T.C. 1105 (1964). Fribourg is inapplicable to this case, and petitioner's citation to portions of that opinion, out of context, fail to overcome the deficiencies of its argument. Both Fribourg and the regulation *535 discussed above are addressed to the impact of fluctuations in market value subsequent to a valid determination of salvage value. In this case petitioner itself appears to have made no determination of salvage value, but simply attacks respondent's determination.Respondent has not redetermined salvage value on account on unanticipated price fluctuations, but has made a determination based on historic market values. We find the salvage value determined by respondent to be reasonable. Petitioner presented two witnesses who testified that, if increases in the prices of new King Airs during the years 1975-1980 were disregarded, the salvage value of the airplane would be 30 percent of cost. We think this misapplication of the premise that price increases cannot affect salvage value renders this testimony of little value. Both of petitioner's witnesses were engaged in the business of selling aircraft, but neither can be considered to be a valuation expert for the purposes of estimating salvage value. Their experience was limited to selling new and used airplanes and valuing used airplanes for trade-in purposes. Both witnesses testified that, assuming that no price increases occurred, *536 the value of the King Air after five years would be 30 percent of its cost. However, it is clear that neither witness ever valued an airplane using such unrealistic assumptions in his own business. One witness conceded during cross examination that his estimate of salvage value does not reflect the fair market value of the airplane. [33] These estimates are not based on any actual experience selling airplanes. Both witnesses conceded that, based on their experience, the resale value of the King Air is very high, even after many years of use; a 1975 King Air could sell for as much as $600,000 in 1983. The testimony of these witnesses is merely further evidence of petitioner's misconception of salvage value. According to his argument, price increases cannot in any way influence salvage value, so that any market value estimation must be adjusted to eliminate the effect of inflation or general price fluctuations. This is simply contrary to the law; salvage value is synonymous with resale value, and petitioner's efforts to *537 avoid this basic proposition by making unrealistic assumptions about market value are to no avail. As we have indicated, respondent's method of determining salvage value from historic market values is reasonable, and we find a salvage value of $565,000 to be amply supported by the record. However, in the trial of this issue for the year 1977 in Denison Poultry & Egg Co. v. United States,supra,the district court found the salvage value of this airplane to be 70 percent of its original cost, which is slightly less than the above figure. Since a determination of salvage value is quite imprecise, we defer to the district court and find the salvage value of the plane during the years 1975 and 1976 to be 70 percent of its original cost. Issue 4: Constructive Dividend
FINDINGS OF FACT Clymer frequently withdrew funds from Denison for his personal use, and caused Denison to make payments for his benefit. In such instances, the withdrawals or payments were charged to Denison's Account 101, which was listed on Denison's books as "Accounts Receivable -- Ray Clymer, Jr." This account had been in existence since about 1950. The balance of Account 101 fluctuated during the years 1974-1976, *538 reflecting the various withdrawals, disbursements, and Clymer's periodic repayments to Denison. The balance of the account ranged from a high of about $536,000 in June 1975 to a low of about negative $108,000 (an amount owed to Clymer) in April 1976. During 1974, Clymer made withdrawals, or caused Denison to make payments for his benefit, which totalled $405,649. By the end of 1974, Clymer repaid to Denison $404,967. The balance of Account 101 was $682 at the end of the year. The repayments to Denison in 1974 included a payment in December in the amount of $399,700. Clymer obtained the funds used to make this payment by borrowing money from banks. He borrowed $250,000 from City National Bank of Wichita Falls (City) and $150,000 from State National Bank of Denison (State). Both loans were made on December 19. The loan from City was on a 30-day note, and the loan from State was on a six-month note. Clymer was not required to post any collateral for either loan. When these loans came due in 1975, Clymer repaid the banks with money drawn from Denison. On January 20, Clymer repaid the $250,000 loan from City, with interest, by writing a check on Denison's account. He then charged *539 $275,223 to Account 101. On June 18, Clymer repaid the $150,000 loan from State, with interest, by writing a check on his personal account after depositing $277,000 of Denison's funds into his account. He charged that amount to Account 101. After the charge in June in connection with the repayment of the loan to State, the balance of Account 101 reached $535,930. However, Clymer made payments to Denison during 1975 totalling $1,036,000, and by the end of the year the balance of Account 101 was negative $9,252. By April 30, 1976, the balance dropped further, to negative $107,912. Clymer never paid interest to Denison on Account 101, nor did he post any collateral. At all times during the years 1974-1976, Clymer had the financial capacity to repay the amounts owed to Denison on Account 101. During this period, his net worth exceeded $2 million. Clymer had a strong relationship with City, where he dealt personally with the bank's president, Harold Jones. He was able to borrow as much as $700,000 without posting collateral, and the bank never questioned any of his loans.Jones testified that he never set any limit on Clymer's borrowing, and would have loaned him as much as $1.5 *540 million. In his notice of deficiency for taxable year 1974 respondent determined that the withdrawals by Clymer, and the payments by Denison for his benefit, constituted a constructive dividend in the amount of $400,179. [34]
OPINION During 1974, Clymer withdrew funds from Denison, and caused Denison to make payments for his benefit, totalling $405,649. Clymer repaid $404,967 that same year, mostly from loans which he later repaid with funds from Denison. The issue is whether the withdrawals and disbursements constitute a constructive dividend to Clymer, as respondent asserts, or whether they should be treated as loans, as petitioner argues. Whether the withdrawals and disbursements in question are properly treated as constructive dividends or loans depends on whether, at the time of the transactions, the parties intended that the amounts withdrawn would be repaid. Berthold v. Commissioner,404 F.2d 119 (6th Cir. 1968), *541 affg. a Memorandum Opinion of this Court; Pierce v. Commissioner,61 T.C. 424 (1974). This is a question of fact to be determined by considering all the facts and circumstances. Berthold v. Commissioner,supra;Roschuni v. Commissioner,29 T.C. 1193 (1958), affd. per curiam 271 F.2d 267 (5th Cir. 1959), cert. denied 362 U.S. 988 (1960). Special scrutiny is required when funds are withdrawn by an individual who controls the corporation. Electric & Neon, Inc. v. Commissioner,56 T.C. 1324 (1971), affd. per curiam 496 F.2d 876 (5th Cir. 1974); Roschuni v. Commissioner,supra.
Despite Clymer's repayment in 1974 of substantially all the funds withdrawn from Denison, respondent urges us to invoke the sham transaction doctrine to negate the effect of the repayment. Respondent contends that Clymer's payment to Denison of the proceeds of the bank loans, and his later repayment of the bank loans with corporate funds, is a mere "manipulation" intended to create the appearance of a loan which lacks economic substance. While we find this particular transaction to be unusual and deserving of close scrutiny in light of Clymer's control of the corporation, we think that the record as a whole indicates *542 that Clymer intended to create a bona fide indebtedness to Denison and at all times intended to repay the funds he withdrew. Although the label a taxpayer attaches to a transaction is not dispositive of its tax consequences, we find it significant that all the withdrawals and disbursements were entered on Denison's books as accounts receivable. See Pierce v. Commissioner,supra;Miele v. Commissioner,56 T.C. 556 (1971), affd. on another issue 474 F.2d 1338 (3d Cir.), cert. den. 414 U.S. 982 (1973). Moreover, Denison's Account 101 had been in existence since about 1950, and the record indicates that over the years Clymer consistently treated the account as a bona fide obligation to the corporation. See Miele v. Commissioner,supra.The fact Clymer did not pay interest to Denison on the balance of the account does not preclude a finding of bona fide indebtedness, as such transactions are common in dealings between shareholders and their closely held corporations. Miele v. Commissioner,supra;White v. Commissioner,17 T.C. 1562 (1952). Clymer's intention to repay the corporation is evident from the consistent pattern of repayments during these years. See Pierce v. Commissioner,supra; *543 Miele v. Commissioner,supra. Clymer repaid virtually all the funds withdrawn in 1974, and by the end of 1975 the balance of Account 101 had been reduced to negative $9,252. By April 1976, the balance dropped further, to negative $107,912. We also find significant Clymer's capacity at all times to repay the amounts withdrawn from Denison. See Wilson v. Commissioner,10 T.C. 251 (1948), affd. 170 F.2d 423 (9th Cir. 1948). Clymer's net worth during this period exceeded $2 million, and his strong relationship with City National Bank enabled him to borrow substantial amounts virtually at will, without having to post collateral. Although respondent disputes the significance of Clymer's net worth, noting that a substantial portion of his assets consisted of his holdings in Denison, this does not alter the fact that Clymer was able at all times to borrow sums substantially greater than his indebtedness to Denison. Compare Electric & Neon, Inc. v. Commissioner,supra.
Finally, we are unable to accept respondent's argument that Clymer's repayment in 1974 should be disregarded as a sham. Although Clymer's use of short-term bank loans which were later repaid with corporate funds is somewhat *544 suspicious, the record does not indicate a pattern of such activity sufficient to negate the consistent and substantial repayments during these years. Respondent seems to argue that such a "manipulation" of the account allows Clymer to roll over the debt to Denison without making any payments of economic substance. This argument is refuted by Clymer's payments to Denison in 1975 and 1976, which reduced the account to a negative balance. There is no evidence that these payments were mere manipulations of accounts; in fact, during 1975 Clymer made payments to Denison totalling $1,036,000 but borrowed from banks a net amount (loans less repayments) of only $350,000. In short, on these facts, respondent's substance over form argument itself lacks substance. On the basis of the record as a whole, we find the withdrawals and disbursements to constitute bona fide indebtedness, and we hold for petitioner on this issue. To reflect the foregoing Decision will be entered under Rule 155.
Footnotes
1. The only other officer of the company, Bob Winkler, served as secretary-treasurer and branch manager, but had no significant responsibilities for the overall business. Winkler also served as a director. He and Clymer were the only directors; the "board" met only occasionally and kept no minutes. Clymer has been the sole stockholder and chief executive officer of Denison since at least 1966.↩
*. All employees received a Christmas Bonus. The formula for determining these amounts was not indicated. ** Twenty percent of Denison's net profit before income tax, per 1970 agreement.↩
2. All section references are to the Internal Revenue Code of 1954, as amended.↩
3. We reject respondent's primary determination in the notice of deficiency that the entire contingent portions of Clymer's compensation for these years are not deductible because they were not paid as compensation. Respondent bases this determination on the fact that these amounts did not appear on Clymer's Forms W-2, no social security or income taxes were withheld, and Clymer reported these amounts on Schedule E of his returns, rather than on the appropriate line for employee compensation. It is clear that these amounts were consistently treated by Denison and Clymer as compensation, despite the reporting errors on Clymer's individual returns. Moreover, respondent stipulated an exhibit which includes these amounts as compensation paid to Clymer. (Exhibit O).
4. These factors include: the employee's qualifications; the scope of his responsibilities; the size and complexities of the business; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable businesses; and the overall salary policy of the employer.↩
5. Petitioner would have us believe that the compensation arrangement cannot be considered a device for reducing tax exposure, given that Clymer's personal tax bracket was 70 percent as compared to Denison's 48 percent during these years. We find it curious, given petitioner's thoroughness in presenting his arguments in this case, that he would overlook the "double" tax on corporate dividends, which results in an effective marginal tax rate on dividends in this case of approximately 84 percent. See B. Bittker and J. Eustice, Federal Income Taxation of Corporations and Shareholders, Para. 1.03 (4th Ed., 1979). Of course, this argument is valid if applied to Clymer's failure to pay interest on advances from Denison. If Clymer paid interest and deducted it he would save 70% of it on tax, while Denison would pay tax at the rate of only 48% on the interest.
6. The record indicates that during the early and mid '70s, Coors beer, promoted as "brewed from pure Rocky Mountain spring water," was tremendously popular. However, the record does not contain information about the proportion of local versus national promotion and advertising that accounted for the beer's popularity. Respondent's expert witness noted articles about Coors' success during this period which suggest that the impact of the distributor on Coors' profitability was minimal. ↩
7. One witness who invested in a Coors distributorship during this period, Harold Jones, emphasized the importance of management in achieving success, despite Coors' popularity. He noted that his return on an investment in a poorly managed distributorship in south Texas was "one can of beer in six years."
8. Azar and his immediate family owned 100% of Dickshire. He set his own salary.↩
9. The report notes that not all of the companies included are "directly comparable in operations" to Denison, but are in the same industry category. No beer distributorships were specifically examined and it does not appear that any beer distributorships were included in the AMA report.↩
10. Petitioners contend that Manley's report "is entitled to no weight whatsoever," and make various objections, most of which we dismiss. We find nothing in Townsend v. Commissioner,T.C. Memo 1980-264↩, which precludes the use of such industry data, subject to the limitations we note below. 11. Although Denison's returns for 1975 and 1976 show contributions to such a plan, it does not appear that this represented any substantial benefit to Clymer. ↩
12. We do note that Manley's analysis to some extent took into consideration the fact that chief executives of small companies may have more responsibility and may be exposed to greater risks.
13. This conclusion is reinforced by our doubts about the extent to which Clymer's efforts, as opposed to Coors' surge in popularity, accounted for Denison's success during these years.
14. Compare amounts approved by the Court as reasonable compensation paid to chief executive officers of companies of similar size in Kennedy v. Commissioner,72 T.C. 793 (1979); Royal Crown Bottling Co. of Winchester, Inc. v. Commissioner,T.C. Memo. 1983-611; Georgia Crown Distributing Co. v. Commissioner,T.C. Memo. 1983-459; Denison Poultry and Egg Co. v. United States,52 AFTR 2d 83- 5148 (N.D. Tex. 1982); Townsend v. Commissioner,T.C. Memo. 1980-264↩.
15. Denison reported its income on the basis of a fiscal year ending April 30.↩
16. Respondent now concedes that only 32 percent of the flying hours for this year are attributable to Clymer's personal use. ↩
17. Most of the depreciation for the King Air was disallowed as a result of respondent's adjustment of the salvage value of the airplane, which is a separate issue in this case. Only $48,877 was disallowed as a result of the personal use of the plane by Clymer.↩
18. This figure is determined as follows: Respondent's adjustment of the salvage value of the King Air (issue #3) leaves a depreciable basis of $216,699. After allowable depreciation of $78,177 in 1975, the depreciable basis in 1976 is $138,502. This amount is fully allowable in 1976 under petitioner's double declining balance method of depreciation, except that 32 percent, or $44,321,↩ is disallowed on account of Clymer's personal use of the plane.
19. Petitioner concedes that the deductions allocable to these flying hours are not allowable. ↩
20. It is appropriate in this connection to note that respondent did not determine, nor does he argue, that Clymer received a constructive dividend by virtue of his use of the corporate airplanes. Whether this creates an inconsistency relevant to the resolution of the deduction issue is a matter we consider below.↩
21. In addition to the operating expenses and depreciation, a portion of the investment tax credit claimed on the King Air in 1975 is in issue. To simplify the discussion, both parties have framed their arguments around the deductions with the recognition that the underlying issue of whether Denison's rental of the planes to Clymer constitutes a trade or business is also determinative of the investment credit issue. See sec. 1.48-1(b)(2), Income Tax Regs.↩ (proportionate part of property qualifying for investment credit is determined by the proportionate par for which a deduction for depreciation is allowed).
22. We not that there is disagreement as to whether these rental payments fully compensated Denison, given Clymer's complete control of the corporation, his unfettered access to the planes and the fact that he paid nothing for standby time on overnight trips.↩
23. See Egan v. Commissioner,T.C. Memo 1982-237↩, where the amount of the constructive dividend was reduced by the amount the shareholder paid for the use of the corporation's automobile. 24. But, see footnote 25, infra, regarding the policy of the Commissioner to allow as an offset against the disallowed deductions the amount of income received.
25. In the notice of deficiency respondent determined that Denison must recapture in 1976 a portion of the investment credit because of a decline in the proportion of business usage of the planes between 1975 and 1976. This issue is not argued by either party on brief so we do not know whether it has been conceded by one party or the other. If not, consideration should be given to it by the parties in the Rule 155 discussions. We also think respondent should give consideration to allowing as an offset to the disallowance of a part of these expenses the amounts Clymer paid as rent for the use of the planes, which we understant is included in Denison's taxable income. Section 183(b) provides for this in the case of individuals and subchapter S corporations, but there is no such statutory provision allowing such an offset for a regular corporation. See Rev. Rul. 75-14, 1975-1 C.B. 90. However, such an allowance has usually been made in the deficiency notices involved in a number of cases decided by the courts, see, e.g., International Trading Co. v. Commissioner,275 F.2d 578, 587 (7th Cir. 1960); Martin v. Commissioner,50 T.C. 341, 365 (1968); and it appears that it has been the general policy of the Commissioner to allow such offsets. See Five Lakes Outing Club v. United States,468 F.2d 443, 446 (8th Cir. 1972); Carkhuff v. Commissioner,T.C. Memo. 1969-66, affd. 425 F.2d 1400 (6th Cir. 1973); Riss v. Commissioner,T.C. Memo. 1964-190; Kanter v. United States,73-1 USTC 9311, 31 AFTR 2d 73-973 (E.D. Va. 1973); Priv. Rul. 7903020 (Sept. 26, 1978); G.C.M. 35809 (May 7, 1974); G.C.M. 36028 (Oct. 1, 1974). Had Denison not allowed Clymer to rent the planes, there would seem to be little doubt that it would have been entitled to deduct 100 percent of its expenses related to the planes.See the corrective order of the district court in Denison Poultry & Egg Co. v. United States,52 AFTR 2d 83↩-5148 (N.D. Tex. 1982).
26. An additional portion of the depreciation on the King Air was disallowed on account of Clymer's personal use of the airplane (issue 2).
27. The District Court case involved Denison's taxable year 1977, for which it filed a claim for a refund after paying the deficiency determined by respondent.↩
28. It is agreed that the cost basis of the airplane was $781,669.↩
29. Under the double declining balance method used by petitioner, the depreciation could be computed without reference to salvage value. Under that method, salvage value functions only as a floor below which the asset may not be depreciated. Unlike the more conventional straight line method, where salvage value is subtracted from the asset's basis before computing the depreciation, under the declining balance method depreciation is computed using the full cost basis of the property. See sec. 1.167(b)-2(a), Income Tax Regs; 1 Bittker, Federal Taxation of Income, Estates and Gifts, section 23.5.3 (1981).
30. Respondent does not challenge the useful life assigned to the airplane. ↩
31. Petitioner's own experience contradicts his contention that the salvage value is only 30 percent of cost. In 1978 Denison traded in the King Air for a new airplane, and received a trade-in allowance of $730,000. Thus, the airplane retained 93 percent of its cost after three years. In addition, the record indicates that a 1975 King Air could sell for as much as $600,000 in 1983.
32. Because the King Air 200 was a new model in 1975, resale data was not available, but Andres studied various other beechcraft planes, including the predecessor of the King Air 200.↩
33. It is clear from the testimony of these witnesses that the increase in the prices of new airplanes has a substantial effect on the resale value of used↩ airplanes.
34. Respondent does not explain why this figure differs from the total amount of withdrawals and disbursements in 1974, $405,649. However, it is clear that respondent contends that the entire amount of the funds used for Clymer's purposes is taxable as a dividend, without regard to any repayments by Clymer.↩